JAMES P. COKER AND LEWIS G. SCHEIFFER, PLAINTIFFS AND APPELLANTS, VS. AMOS HAYES, DEFENDANT AND RESPONDENT.

1. It is the rule of the Code, as well as of the common law practice, that a party cannot, during the progress of the trial, rely with confidence on the strength of his case, take no exception to matters as they occur, or to the charge of the court as given, and afterwards claim the right, either through a motion for a new trial, or otherwise, to have matter already acquiesced in and accepted by him reviewed in an Appellate Court.

2. A simple objection to a question when asked, without an exception to the ruling if the objection is overruled, presents a case of abandon-

ment of the objection. To make such a point available, it is necessary that an exception should be distinctly taken, and placed upon the record.

3. A leading question should be permitted only when it appears essential to justice; where a witness is persistently unwilling, or biased, or there exists some like reason, the court should allow it. In some cases a party may and should be permitted to lead his own witness. This matter, however, is in the discretion of the court. It is not ground of error, and Appellate Courts universally refuse to review such exercise of discretion.

4. After a witness has been examined in chief, and is recalled in rebuttal, the court may, very properly, prevent a simple repetition of his testimony. A party after his examination of a witness, and after closing his testimony, has no absolute right to recall this witness to establish matters not in rebuttal. Whether this rule ought to be varied is a question for the Circuit Court, and an Appellate Court, if it interferes at all, should only do so where it sees that injustice has been done through this action.

5. Questions leading to testimony apparently not pertinent to any issue are properly overruled.

7. Where, upon the face of the record, a question clearly open to the objection that it is leading and suggestive is rejected, and no ground for its rejection appears upon the record, the action of the court must be attributed to this cause, notwithstanding the fact that the inquiry was as to matters properly admissible in rebuttal of antecedent testimony.

7. Where the trial is by jury, the charge of the court must be excepted to when given. Such is the rule when the bill of exceptions is framed under the statute of Westminster II., and such is the rule under the Code.

8. Where the conflicts in testimony are of such character as to involve principally questions of credibility, this court will not assume to perform this exclusive function of a jury. Under the modern system, where parties are permitted to testify, the best tribunal to determine how far a man's interest controls him is a jury of the vicinage. An appellate tribunal is least of all fitted for such a function.

9. Facts alleged in support of a motion for new trial on the ground of surprise, must at least be sworn to, or supported by authentic documentary evidence showing merits. The mere statement of a party is never sufficient.

10. The affidavit of a party based upon information and belief derived from statements of members of a jury as to their conduct in the jury

24

room, is entitled to no more or other weight than the affidavit of a juror himself; it must stand on the same footing.

11. A juror, after solemnly entering his verdict in court, " is not to be believed or heard " when he afterwards swears that he never approved or consented to the verdict. After the return and affirmance of a verdict in open court, the testimony of jurors as to the motives and influences by which their deliberations were governed should not be received.

Appeal from the Circuit Court for Jackson county.

This case was commenced prior to the adoption of the Code, but the judgment was rendered subsequent thereto.

The facts of the case are stated in the opinion of the court.

*McClellan & Milton* for Appellants.

*Geo. S. Hawkins* for Respondent.

Mr. Justice Westcott delivered the opinion of the court.

This is an action of trover to recover the value of 43,816 pounds of lint cotton alleged to be the property of plaintiffs, and to have been converted by the defendant. The declaration is in the usual form. The defendant plead—first, the general issue; second, that the plaintiffs were not lawfully possessed of the cotton as of their own property; third, because the alleged conversion was and is based upon an alleged contract for the sale of said cotton by defendant to plaintiffs; that plaintiffs did not, under said alleged contract, accept said cotton or part of it, and actually receive the same or give anything in earnest to bind the bargain, or in part payment; nor was there made any note or memorandum in writing of the said bargain or contract and signed by the plaintiffs and defendant, or their agents, thereto lawfully authorized; fourth, that the plaintiffs' alleged cause of action arose from and is founded upon a contract for the sale of the cotton set forth in the plaintiffs' declaration,

between the said Louis Scheiffer and defendant, on or about the 11th day of February, A. D. 1868; that said cotton was obtained from defendant by the fraud, covin and misrepresentation of the said Scheiffer, and that owing thereto defendant was induced to enter into the same; that previous to entering into said contract he asked the said Scheiffer if there had been any advance in the price of cotton in the market; that said Scheiffer answered in the negative, but that he wished to invest in cotton; and defendant avers that there had been a considerable and material advance as to its price immediately previous to the making of said contract, and this defendant has been informed and believes and charges the fact to be that the said Scheiffer was fully aware of and knew of said advance; and that his answer to said defendant's inquiry, as above set forth, was false in fact and in fraud of defendant.

The plaintiffs took issue on the first and second pleas, traversed the third; and so far as the fourth plea or answer was concerned it was filed under the Code practice, and no response was made to it.   Upon the trial there was verdict for the defendant.   There was a motion for new trial by plaintiffs, which was overruled, and from the consequent judgment for defendant this appeal is taken. .

It is thus apparent, the issues all being issues of fact, that the case can be here alone upon exceptions taken during the progress of the trial to the charge of the court, and to its action in overruling this motion for new trial.   The assignment of errors embraces twenty-two distinct points. Many of them embrace matters to which no exception was taken during the trial.   Portions of the charge of the court too, to which no exception was taken when given, and which were assented to by the appellants when delivered, are sought to be reviewed without any exceptions.

It is the rule of the Code practice, as well as the rule of the common law practice, that a party cannot, during the

progress of the trial, rely with confidence on the strength of his case, take no exceptions to matters as they occur, or to the charge of the court as given, and then afterwards claim the right, either through a motion for a new trial or otherwise, to have such matter already acquiesced in and accepted by him reviewed in an appellate court. The Code in such a case as this provides that the judge who tries the case may entertain a motion, to be made on his minutes, for a new trial upon exceptions, or for insufficient evidence, or excessive damages; and that when an appeal is taken a case or exception must be settled in the usual form, upon which the argument of the appeal must be had. Code, page 64, Sec. 210. Some of the courts of New York hold that such a motion for a new trial can be only upon the grounds named in this section. Voorhees Code, 390, d.

It appears from the case and exceptions that during the progress of the trial, several questions to witnesses were objected to when asked, but there was no exception to the action or ruling of the court admitting them. In such cases it must be held that objection was abandoned. 9 Pet., 418; 7 Wall., 571; 8 Dana, 178; 15 Ind., 4.

The Supreme Court of the United States in Taber vs. Cooper, (7 Wall., 571,) in speaking of just such a case, says: "It does not appear that the objection was overruled and exception taken; it only appears that the testimony was admitted after the objection was made. *Non constat*, but the objection was waived or the decision acquiesced in. In order to make such a point available it is necessary that an exception should be distinctly taken and placed upon the record." This is likewise the rule of the Code.

The first exception taken during the trial is disclosed by the record in this language:

"H. C. Lewis. $50. Identified bill. Objected to and overruled. Excepted to."

It is claimed by the plaintiffs that there was a part pay-

Coker and Scheiffer v. Hayes—Opinion of Court.

ment in the matter of the alleged sale of seventy-seven bales of cotton to them by the defendant, and that this part payment consisted of the balance of a fifty-dollar note, which remained after paying for a bale of cotton purchased from defendant as the agent of another person. It is claimed by the defendant that the fifty-dollar note was returned to plaintiff at his request, and that the alleged contract to sell or the sale was rescinded. The claim is that H. C. Lewis returned the note. In his testimony he states that it was the identical bill. No ground of objection is here stated, and we are left entirely to presumption to understand upon what ground this objection was based. We can see none. It was pertinent to questions at issue and admissible.

Defendant was asked: " Did you deliver cotton to either of the plaintiffs at Neal's Landing in February, 1868, or at any other time?" The plaintiff objected to this question upon the ground that it was leading, and because it asked for a conclusion of law. One of the questions in this case is, whether there was a delivery of the cotton? This question is certainly leading. We cannot see why the presiding judge did not disallow it. A leading question should be permitted only when it appears essential to promote justice. Where a witness is persistently unwilling and biased, or for some like reason, the court may allow it. While this is true, yet such an exercise of discretion is not reviewable upon error. Such is not the practice of courts where they have like authority to this court to review the action of the inferior court in the matter of refusing new trials. 3 Allen, 465 ; 2 Gray, 282 ; 7 Ala., 371 ; 43 N. H., 65 ; 30 Mo., 380 ; 13 Ala., 490 ; 37 Maine, 346 ; 36 Maine, 137 ; 9 Conn., 275 ; 43 N. H., 65 ; 22 N. J. L., 372 ; 20 Ill., 35 ; 20 N. Y., 170 ; 64 Maine, 280 ; 78 Ill., 544 ; 1 Green Ev., 435.

This question is also open to the second objection viewed in one respect, and viewed in another it is not. The question did not necessarily imply such delivery as transferred

title rather than possession. Delivery is sometimes used in reference to the passing of the property in the chattel; sometimes to the change of the actual possession of the chattel. The connection in which the question is asked shows that it referred to the change of actual possession of the chattel in this case. That was a fact bearing upon the issue, and a matter to which the witness could be properly interrogated.

A receipt of L. Scheiffer & Nephews to Messrs. Freeman, Johnson & Co. for fifty dollars, "deposit made, with H. C. Lewis, of Greenwood, Fla., by Louis G. Scheiffer," was offered by plaintiff in connection with the testimony of H. C. Lewis. It was objected to, the objection was overruled, and there was an exception. H. C. Lewis testified that this money was sent by him to these parties for the plaintiff after plaintiff had requested him to send the money to him. The court instructed the jury that the receipt in itself was evidence of a deposit and nothing more.

If the jury believed the testimony of Lewis, he had authority from the plaintiff to get this money. This receipt shows that he (Lewis) did get it, and it was evidence of that fact. Hence, it was evidence bearing upon the issue whether the plaintiff ever received and accepted the return of the money which he alleged he paid the defendant.

Coker, one of the defendants, testified: "I knew that Mr. Belser would deliver cotton to the purchasers without a written order from the parties storing the cotton with him when he had sold the cotton." This was "objected to by the defendant and the objection sustained." To this action plaintiffs excepted. What was the ground of objection here upon the part of either party, we cannot ascertain from the record. We cannot, and do not see, however, the materiality or relevancy of this statement. The plaintiffs do not here claim any delivery by Belser, except as the agent and representative of Hays. The claim is that a part of the cot-

ton was weighed in Hays' presence, and delivered by him, and that the remainder was subsequently weighed and delivered by Belser in conformity with the instructions of Hays. I cannot see the relevancy or materiality of any of this testimony of the witnesses as to the custom of Belser, the warehouseman. The plaintiffs do not claim title through the observance of any custom. They claim no delivery, except through the act of the defendant himself, independent of what was the usage at this warehouse. Certainly this statement, that Belser would deliver without written orders, if it is meant to establish the fact that Belser would undertake, in the absence of the owner and without his authority, to deliver parcels left with him, is a matter not at all material, when it is not even claimed here that Belser made any such delivery. In addition to this, Belser himself had testified that he had delivered cotton on written or verbal orders; that he had delivered cotton without either to merchants, and that he would have delivered cotton on Coker's representation without an order. This was not denied by the defendant, and notwithstanding the rejection of this testimony of Coker as to Belser's personal confidence in individuals, the matter, so far as it could have any bearing upon the transaction, was before the jury. The witness Coker was asked the question: "Did you and L. G. Scheiffer, at Neal's Landing, on the 13th February, A. D. 1868, accept and receive the 77 bales of cotton from Amos Hays?" He answered: "We did; we weighed it, marked it, and received it." Upon motion, this was struck out, and plaintiffs excepted. This witness was here being examined, it is claimed, in rebuttal. He had testified to the facts as they occurred. He had testified that Hays had delivered the cotton when it was weighed, and that Hays was present when he exercised acts denoting exclusive possession. Hays had testified that he had not delivered the cotton; that he was there for the purpose of weighing it, and that his inten-

tion was to do nothing more until he was paid for it. Coker had already testified as to the acts done. This witness had been examined and cross-examined. The strict rule is that the plaintiffs were bound at their peril to ask all material questions in the first instance, and if omitted it could not be done in reply. When evidence is strictly to rebut the case made by the defendant, such evidence may be admitted, although it might have been adduced as part of the original case. This testimony was not strictly in rebuttal. It was simply repeating by the same witness his examination-in-chief. (2 Phil. Ev., 4th ed., 912.) Under these circumstances this rejection of a leading question and statement of conclusions is not a matter which will authorize us to award a new trial. The court could, in its discretion, reject the testimony, and in no event can we see that such action is ground for us to reverse the judgment.

"Did Amos Hayes make any objection to what you and Scheiffer said about running a letter through the cotton and turning the cotton out of the warehouse ?"

This question was ruled out, and the action of the court excepted to. This witness in his direct examination had stated, "Belser wanted to throw it.(the cotton) out of the back shed. I objected. It might burst the hoops, or damage it. I remarked to Scheiffer, in presence of Hayes, we would not letter it. When we got the full account it would be easy for Baker to letter it for us." When recalled he had already testified : "I claimed the possession, with Mr. Hayes' full consent and knowledge that I did claim it. Scheiffer said 'what letter shall I run through it?' I told him 'we would not letter it until we got two hundred bales, &c.'" We cannot see from the testimony that Mr. Hayes admitted that he heard this conversation, or that he stated that he objected to it. The examination-in-chief of this witness (Coker) had been closed, and there is nothing here in rebuttal, as distinct from evidence, to make out the

case of plaintiffs. This should have been brought out upon the direct examination. There is really nothing in it which this witness had not already testified to. He had already stated that Hayes had assented to his possession ; he had said, " Mr. Hayes was present all the time when I objected to cotton being rolled out, and we wanted it to remain there some time. Hayes did not object to it."

A party, after closing the examination of a witness, and after closing his testimony, has no absolute right to recall a witness before examined by him to establish matters not in rebuttal, or to simply repeat his testimony. 2 Phil. Ev., 914, 4 Ed.; 11 Barb., 216. Whether this rule ought or ought not to be varied, is a question for the Circuit Court; and a Court of Error, if it should interpose at all in such matters, should not do so except where it sees that injustice has been done through this action. 2 Phil. on Ev., 4 Ed., 879, note ; 4 Wend., 249 ; 6 Wend., 368. Here the matter was already before the jury so far as this witness was concerned.

This witness thus recalled, was asked whether, after the 19th of February, 1868, Scheiffer did not leave the whole subject matter of the purchase of the seventy-seven bales of cotton from defendant solely under his control, and also whether they did, after that date, dissolve their agreement to purchase two hundred bales of cotton to ship to Liverpool. The court sustained objections to these questions, and there was an exception. What the agreements or arrangements between these parties subsequent to February 19th, as to shipping cotton to Liverpool, have to do with the sale of cotton by defendant to them upon that date, we cannot see. There is no such issue presented by the pleadings. This question, so far as it relates to this agreement, was properly overruled. The only purchase in question here was an alleged purchase of seventy-seven bales of cotton from defendant. If there was any such purchase it was

made on or before that date.  Such is the claim of the
plaintiffs themselves.  Any dissolution of an antecedent
agreement to purchase two hundred bales could not affect in
any way the rights of these parties ; nor was it either directly
or indirectly in rebuttal of the testimony of Lewis, or any
other witness.  Everything that Lewis says is consistent
with a dissolution of such agreement, if such agreement ever
existed.  The record does not disclose the ground upon which
the question as to the control of the alleged purchase from the
defendant was overruled, nor does the record disclose the
reason why the court would not allow the question.  It sim-
ply appears to have been objected to, and the objection sus-
tained.  It may have been rejected upon the ground that it
was leading and suggestive.  This it certainly was, and the
court could have properly rejected it on this ground alone.
It is true an affirmative answer to the question would have
tended to show, that as between the plaintiffs, Coker had at
that time control of this matter, and that any act of Scheif-
fer, looking to a recission of the alleged sale, was inconsist-
ent with that portion of the testimony of Lewis to the effect
that Scheiffer requested of him the return of the money
alleged to have been delivered and accepted as a part pay-
ment.  In this view the testimony was properly in rebut-
tal.  The record, however, does not disclose upon what
ground this question was not permitted ; and as it may have
been properly rejected on the ground of its leading charac-
ter, we are obliged to hold the action of the court correct.
Where, upon the face of a record, a question clearly open
to the objection that it is leading and suggestive is rejected,
and no ground for its rejection appears upon the record, the
action of the court must be attributed to this cause, not-
withstanding the fact that the inquiry was as to matters
properly admissible in rebuttal of antecedent testimony.

After this, in the record, follow the charges of the court,
both general and special.  To neither was there any objec-

tion or exception, so far as the record discloses. We do not propose to discuss them, however, as they are not presented for our consideration. Where the trial is by a jury, the charge of the court must be excepted to when given. Such is the rule where the bill of exceptions is framed under the statute of Westminster II. This practice prevails in the Supreme Court of the United States. In a like case to this, where the party failed to except while the jury remained at the bar, that court said : " It has been repeatedly decided by this court that it must appear by the transcript, not only that the instructions were given or refused at the trial, but also that the party who complains of them excepted to them while the jury was at the bar." 15 How., 160 ; 13 Ind. 400 ; 1 Iowa, 121 ; 37 Vmt., 471 ; 2 W. Va., 285 ; 15 Cal., 183 ; 31 Mo., 530 ; 11 Ill., 72 ; 8 Ind., 376 ; 3 Iowa, 216 ; 30 Me., 378 ; 14 Md., 424 ; 5 Cush., 14 ; 43 N. H., 497 ; 1 S. & M., 679. Such is the rule in New York. 2 Com., 98. In 2 Seldon, 235, the Court of Appeals remarks : " It has been held in many cases that the party complaining of a charge of a judge must put his finger upon the point of which he complains. If he does not do so, no court of review can regard it. A just regard to the fair administration of justice requires that when an error is supposed to have been committed, there should be an opportunity to correct it at once, before it has had any consequences, and does not permit the party to lie by without making his objection, and take the chance of success on the ground in which the judge has placed the cause, and then if he fails to succeed avail himself upon objection, which, if it had been stated, might have been removed."

What has been said disposes of all the exceptions taken upon the trial, and of all matters anterior to the verdict. Under the Code (Sec. 210) the only remaining question is, was there " insufficient evidence or excessive damages ?" It is not claimed that there was any excess in the matter of

damages, and, therefore, what we may say should be confined to the "insufficiency of the evidence," if the effect of this section of the Code is thus to fix the power of the court. In one of the cases in New York, treating of this section, the court says, that independent of the terms of the Code, the court before whom the cause is tried has inherent power to prevent injustice by setting aside a verdict manifestly in violation of law. 40 N. Y., 45. If it is meant by this that the court is not restricted in its power by this section, and that it has the same power that it had independent of it, then we cannot see where the statute is given any effect; but it is unnecessary in this case to construe this section, as in any event, whether the rules controlling are those which result from a strict application of the section, or those which prevailed before its enactment, our conclusion in this case is not changed. The remaining grounds upon which a new trial is sought are, that the verdict was contrary to the evidence, to the law, and upon the ground of surprise and misconduct of the jury.

This leads us to a consideration of the evidence as applied to the issues. There is in this case no doubt of the conversion by the defendant, if the plaintiffs had such a property in the goods as is sufficient to maintain this action. The plaintiffs claim property, through a completed sale by the defendant to them, and the true merit of this controversy is just at this point. Much has been said in this case about the matter of earnest to bind a bargain. We dispose of it all by simply stating that it may be admitted for the sake of disposing of the question, that there was earnest given and received to bind a contract of sale and that is not sufficient. The true question here is as to the nature of the sale, and whether there was delivery and payment or a tender equivalent to payment. "No case has been found in the books in which the giving of earnest has been held to pass the property in the subject-matter of the sale, where the completed

bargain, if proved in writing, or any other sufficient manner, would not equally have altered the property."

In the case of Logan vs. Mesurier, (6 Moore P. C., 116,) it was held that where the whole purchase-money had been paid at the time of the contract, property did not pass in the the timber, which was afterwards to be measured on delivery; and it is scarcely conceivable that a penny delivered under the name of earnest could be more effective in altering the property than the payment of the entire price. It is therefore submitted that the true legal effect of earnest is simply to afford conclusive evidence that a bargain was actually completed with mutual intention that it should be binding on both, and that the inquiry in such cases is to be tested not by the fact that earnest was given, but by the true nature of the contract concluded by the giving of the earnest. Benjamin on Sales, 2d Ed., 289.

The principal witnesses in this case as to the fact of delivery and part payment are the parties and the warehouseman Belser. This testimony is substantially as follows:

The plaintiff, Scheiffer, testifies: "That there was an agreement to sell plaintiffs' seventy-seven bales of cotton at ten cents per pound, he agreeing to pay defendant $1000 cash, and give a draft for the balance; that defendant stated that all of the cotton was at Neal's Landing except a few bags, and that he would have it all there by Thursday, at which place it was agreed they would meet and deliver the cotton on that day; that, meeting defendant on that day, he declined to take drafts, but said he would deliver the cotton, and I could have ten or fifteen days to pay for it in; that we then went to the landing; the greater part of it was stored in Belser's warehouse; the cotton was turned out, and Coker and myself marked it, and kept tally of the weights, Hayes being present during the weighing; Hayes asked us if we wanted to buy a bale more at the same price, belonging to one of his hands on his place, and we could

pay cash for it; we said yes, and I gave Hayes fifty dollars, which Hayes said was more than it amounted to, as the bale weighed but four hundred pounds, and that he had no change; I then told him to keep the change and credit it on our purchase now being delivered; when it became late Hayes left and told Belser to send him a memorandum of weights. On the next day, Friday, Belser and myself completed the weighing." Upon cross. examination witness states that defendant never, in his presence, instructed the warehouseman not to deliver the cotton to any person without his order or the production of the warehouse receipt.

The plaintiff, Coker, testifies: "On the 11th February, 1868, Mr. Scheiffer and I went to Hayes' house. We told him we wanted to buy his cotton, Scheiffer agreeing to give drafts, defendant saying he would take them; that he would need $800 or $1,000 to pay off hands. We bought the cotton at 10 cents. We were to meet at Neal's Landing on the following Thursday to weigh and deliver the cotton. On meeting again Thursday, defendant said he did not want drafts, saying I have proposed giving Mr. Scheiffer ten or fifteen days to raise the money in, and that he (H.) would put up five hundred dollars, and we put the same amount as a forfeit, and if either one backed down the man who did so was to pay the amount." (Scheiffer also testified to this.) "This we declined upon the ground of confidence in his word. Defendant said I am satisfied—come on, we will go down to Neal's Landing, and I will weigh and deliver you the cotton. When we got to landing we told Mr. Belser our business, that we had bought Mr. Hays' cotton. We went to the shed. Belser wanted to throw it out of the back of the shed. I objected; it might burst the hoops. I proposed to take Hays' weights. He said he would do it, but he had left his memorandum at home. I put weights on bags; Scheiffer took weights in book. I remarked to Hayes in presence of Scheiffer we would not letter it; that when we got

the full amount it would be easy for Belser to letter it for us. Of these lots of cotton some were poorer than Scheiffer thought. After weighing twenty bags Avery came up and wanted to go in the store. Belser had to quit. Hayes then remarked I have another bale for sale that belongs to a negro, weight about 400 pounds. I told him yes, and asked Scheiffer if he had any money. He said yes, and handed Hayes fifty dollars. Hayes remarked he did not have the change. Scheiffer told him to put the amount of balance on the purchase. Belser came back, and had weighed about forty bags. Hayes said his wife was unwell, and he never remained away from home at night; that he had confidence in Belser as much as in himself. He got in his buggy, and hallowed back to Belser, don't let Coker cheat you, in a laughing manner. He requested B. to make him out a list of weights of cotton and send to him. I left and saw no more weighed. Mr. Belser and Scheiffer continued weighing cotton. After purchase made on Tuesday, it was part of the agreement that we would go to Neal's Landing and weigh and deliver it all that day." This witness was again examined, and stated that " Hayes at the time we went to weigh the cotton at Belser's delivered the cotton to us. I claimed possession and refused to have the cotton throwed out of the shed without Mr. Hayes' full consent and knowledge. I did the marking and putting weights on heads of bales as long as I remained ; there were forty-six or forty-eight bales weighed before I left. Scheiffer said, what letter shall I run through it. I told him we would not letter it until we got 200 bales to ship to Liverpool, and Belser could easily letter it then when ordered shipped. Hayes was present when at the landing. I gave directions about it as if it were my property." On cross-examination, as to this second examination this witness says : " I never lettered any of Hayes' cotton. He (Hayes) did not, on the 13th February, when we were weighing the cotton, say to

me or Scheiffer, I deliver the cotton to you. I never received any written or verbal order on Belser to deliver the cotton. The entire money for cotton was not paid. We bought the negroes' bale of cotton and balance, 'became advance on the other.' Admitted that Belser says that he had never delivered the cotton to Coker or Scheiffer." (Judge's notes, page 44, and amendment No. 4.)

Belser, the warehouseman, for the plaintiff, testified: "The parties came to my landing to weigh cotton. I think Hays had 77 bales stored there. They came together, and requested me to weigh it. I asked if cotton was to be shipped soon. I wanted to throw it out below. They objected. We weighed the cotton in shed. It took that day and part of next. On leaving, Hays requested me to represent him. Can't remember what was said as to shipping and marking. A good deal said of it. Don't remember hearing the parties say anything about the payment for cotton. I saw one of them hand Hays money. Hays said that a negro had a bale of cotton they could get at the same price; handed him money. Hays said he had no change. Coker, or one of them, requested him to keep it. Don't remember any other words. Don't remember what the bale weighed. I bought a bale from the negro. Think same bale. Paid him 11 or 11½. It weighed between 400 and 500 pounds. Nothing said at the time what the price was. I understood Hays had sold the cotton at 10. Can't say who told me. Mr. Hays asked me, in going out from dinner, if I did not think they had 'got me a little.' I told him I thought they had. My recollection is, Hays stated they tendered him exchange or drafts on New York, but he required the money, and gave them time to go to Apalachicola for it. Mr. Hays never gave me a verbal order to deliver the cotton to Mr. Coker or Scheiffer, and I never delivered them any for him."

The defendant testifies: "I remarked there was a boy on

my place who had a bale of cotton he wanted me to sell, and wanted me to sell it for him. Mr. Scheiffer remarked he would take the bale of cotton, and that he would give me the money to pay for it. He handed me fifty dollars, and I remarked that was more than the bale of cotton came to; that I did not think it was a very heavy bale; that I had no change. He said keep it; it made no difference. That was what passed about the bale of cotton. Neither Coker nor Scheiffer told me to apply the surplus towards payment of the other lot of cotton. The bargain for sale of cotton was made on the 11th February, 1868. I asked if there was any rise in cotton; said none that they knew of. Mr. Scheiffer said he would buy my lot and give me ten cents a pound for it. I told him I concluded to take the offer he made. He remarked he was not prepared to pay for so large an amount of cotton, and that he would give me a draft on New Orleans or New York. I did not wish drafts on New York or New Orleans. He said he was not prepared to pay money for it if I did not take drafts. I told him I wanted some money to pay the hands that made it. Hands due one-third. He asked me then what amount I would need to settle off with them. I told him it would take about one thousand dollars. He remarked he did not have that amount but thought he could raise it. When we got to that, I said you and I don't know what the cotton will weigh to ascertain how much you would have to pay me. We agreed to go to the river to weigh the cotton on Thursday. We met at Greenwood on Thursday morning. I told Mr. Scheiffer I concluded not to take any drafts for my cotton; that I must have the money. He said that would break up the trade; that he did not have the money. Scheiffer asked me then how long a time I would give him to raise the money. I remarked eight or ten days. He said then we will go to the river and weigh it to ascertain how much money he would have to get. No part of the contract

in writing. When we arrived at the river, said to Mr. Belser, I have come down to weigh my cotton. The plaintiffs were present when I said this. Mr. B. assked me if I was going to have it turned out of the warehouse. I said I had rather not, as I did not know when the cotton would be delivered as he did not have the money. We weighed twenty-seven bales. Belser was the weigher while I was there. I left about an hour by sun. I don't know who weighed after I left. I never gave any order or warehouse receipts or verbal order to Belser to deliver the cotton to Scheiffer or Coker. I could not tell how far Coker and Scheiffer were from me when I gave Belser instructions as to the cotton. I was near enough to Belser for him to hear me. I instructed him as I was going away to finish weighing the cotton, to send me the weights, and not to turn over the cotton to any one without both a written order from me and the warehouse receipt, as the cotton was mine. I never received any money on this contract as payment, or otherwise, at any time."

As to the fifty-dollar bill this witness says : " I told Scheiffer he could get the cotton of boy at the same price ; he handed me fifty dollars ; I had not weighed the cotton at that time. While at Greenwood on Thursday, I proposed to Mr. Scheiffer to put up a forfeit of five hundred dollars, the one backs out to pay the forfeit ; this was after I had told Scheiffer I would not take drafts. About the time I told him I would give him time to get the money, I made proposition to see what he was going to do, if he was going to try to get money. On reaching the river I said to Mr. Belser, don't you think he got me a little ? From Belser's remarks I thought there was little spur in the market. I left Belser to finish weighing the cotton ; the weights of the bales as shown by exhibit in evidence was 43,816 pounds, which, at 10 cents, is $4,381.60." Belser, being again examined, says : " Hayes gave me instructions as to shipping

and delivering cotton; I am satisfied Coker and Scheiffer did not hear them."

The theory of the plaintiffs as to this testimony is that the contract as modified on Thursday, at Greenwood, was that ten or fifteen days' time was given for payment; that the cotton was weighed and delivered at the landing on that and the next day, and a part payment of eight or ten dollars on the amount due was paid. In other words, that the sale was a sale on credit, and that the property passed by an actual delivery.

The theory of the defendant is that he refused positively any drafts; that no credit entered into the matter; that the agreement was for a sale for cash, the plaintiffs to have ten or fifteen days to raise the money; that all that was done at the landing was simply a weighing of the cotton to ascertain the price; that no delivery was had, and that none was to be had or made, and no property was to pass until he was paid the price at the time agreed upon; that he received nothing, either as earnest or part payment from the parties; that defendant agreed to a sale for cash, giving time to raise the money, the property not to pass until payment. Benjamin on Sales, §320, and cases cited.

We do not propose to enter into any elaborate examination and discussion of this testimony. It is not our province to weigh such conflicts or discuss credibility. No one, unprejudiced and disinterested, can read it without seeing that the question involved is a pure question of credibility. How can it be said from this testimony that it is clear that the owner intended to part with his property, and that it was the intention of the parties that the property should pass, before payment of the price, or that there was a sale upon credit of eight or ten days, when the defendant, according to the testimony of all the parties, refused drafts, and only agreed to sell for money, giving time to raise it? In other words, in the language of the appellant's counsel, "Coker

and Scheiffer were to pay all cash, and have ten or fifteen days to raise the money in." There cannot be a sale for cash on credit.

In addition to the testimony of the parties and Belser, showing the actual facts connected with this transaction, we have in the record the testimony of McNealy, Robinson, Parker, Erwin and Bryan, as to the statements of the defendant made to them at the time. McNealy says Hayes told him he had sold the cotton, but would not let the parties have it, as cotton had gone up and no money paid him. Robinson says he was at the landing; that Mr. Hayes said he had sold; that he was to get ten cents, and was to weigh it that day. Parker states that Hayes told him that he had sold his cotton for ten cents; that he was to go down in a few days and deliver it, provided they had the money for it. Erwin states that Hayes told him he had sold his cotton for ten cents, and was going to the landing on that day or the next to deliver it. " We had a conversation about drafts. I told him I did not consider any man's draft as good as the money." All of these statements, it is apparent, relate to a debt antecedent to any identification or weighing of the goods. There was no contract in writing. It is not even claimed that at this time any earnest had been paid or part payment made. The conversation of Erwin very plainly relates to the time when Hayes said he would take drafts. It is admitted that he refused to do so afterwards. What he says to Parker appears to have been after he had given time to " raise the money in," as he says he had sold to deliver it, provided they had the money to pay for it. These statements are consistent with the testimony of the parties. What Hayes meant and what alone he could mean by the term sold when used anterior to the meeting at the landing, was a simple verbal agreement or bargain to sell without earnest, part payment, or anything making it effective. These witnesses are not testifying in view of nice legal dis-

tinctions like this, but connecting the circumstances with the other testimony, what we have stated is all that it amounts to.

But it is insisted that there was a tender within the time agreed upon of the price to be paid, and that the effect of this was to pass the property. It is unnecessary to state the law as applicable to such a state of facts, unless such facts are shown.

The testimony of plaintiff Scheiffer as to this matter is as follows:

"On the same evening that the weighing was completed I went to Apalachicola, stayed there a day under heavy expense, and with great difficulty raised the money, barely $4000. Upon my return from Apalachicola, Mr. Coker and I went to defendant's house to pay for cotton. Mr. Hayes met us at the gate; I told him I had just returned, let us go in some safe place and I will pay what I owe. Hayes replied, gentlemen, you can't have my cotton. I replied, the cotton is ours." Upon cross-examination he says, "I pulled the money out of my lap."

The plaintiff, Coker, testifies: "That upon arrival at Mr. Hayes' house, Scheiffer told him we don't want to disturb you; we want some private place to pay you, and pulled the money out in his hand. Mr. Hayes remarked, you can't have the cotton. Scheiffer remarked, it is our cotton; we bought it, received it, and advanced on it. Mr. Scheiffer had about $5000; we counted it in my office before we went there. Mr. S. took the money out of pocket in hand and said we want a private place to count it. This was the Wednesday after we weighed cotton at Neal's Landing."

Amos Hayes, the defendant, testifies: "That neither Scheiffer nor Coker exhibited any money to him in payment of the cotton on the 19th of February, A. D. 1868; I saw no money."

James E. Bryan testifies: "That he witnessed part of an

interview between the parties on the 19th of February, 1868; saw no money tendered defandant for a lot of cotton; A. P. Hayes way present; I do not state all that was done on that occasion."

A. P. Hayes testifies: "Was present when plaintiffs came up on the 19th of February, and witnessed the interview between them; nothing was said about the payment of any money by the plaintiffs to the defendant; saw no tender and heard no offer to pay except the money offered by Hayes to plaintiffs; that no other money was exhibited upon the occasion, and if any had been he would have seen it; was in five or six feet of them all the time; neither of the plaintiffs offered to pay the defendant a large sum of money on account of cotton, nor did either of them offer to go to any place where any money should be counted for that purpose, nor did Amos Hayes refuse to do so; am a brother of Amos Hayes."

Plaintiff Coker, in rebuttal, testifies: "A. P. Hayes and Bryan were not present when I had the conversation with Amos Hayes about the cotton; they were some distance from us, and considerable conversation had passed before they came up; Scheiffer pulled out the roll of money and said, let us go to some safe place so we can count it."

It is thus seen that Coker swears to a tender, and that A. P. Hayes was not present. A. P. Hayes swears he was present all the time, and that nothing of the kind happened. Scheiffer swears that he said to Hayes, let us go in some safe place and I will pay what I owe on the cotton, and that he pulled the money out of his lap. Hayes swears that neither Scheiffer nor Coker exhibited any money to him in payment of the cotton; and Bryan, who was present a part of the time, saw no money tendered. Again we have simply a conflict of testimony—a pure question of credibility. Plaintiffs swears to one state of facts; defendant swears he saw no money, and his brother swears that he was present

all the time, and that there was no tender or offer to count the money.

What principle of law will justify us in setting aside a verdict of a jury because one or the other of these parties was not believed? If there is any question exclusively for a jury it is just this question. A court or judge, presuming to set aside a verdict under these circumstances, exceeds legitimate constitutional functions, and takes from the citizen one of his first and greatest rights. This is especially true where, under the modern system, parties are not excluded from testifying on account of interest. In conflicts of this character, the extent to which a man is or will be controlled by his interest is a question necessarily involved, and there is no tribunal or body of men so well qualified to pass upon that question as the residents of the vicinage; certainly an appellate tribunal is least of all fitted for such a function. This matter must rest where the jury placed it.

There was evidence also applicable to the pleas of fraud and to the alleged rescission of contracts. As to the first, the evidence is equally, if not more conflicting, than it was as to the primary matter of the sale itself. As to the second, the evidence was that of one witness for the defendant, who stated that at Scheiffer's request he obtained and sent to the firm of which S. was a member the amount which the plaintiffs insist was paid as a part payment on the alleged sale, as well as to certain statements of plaintiff Scheiffer in reference to the sale made subsequent thereto. There is no ground for a new trial as to either of these matters.

This brings us to the consideration of the alleged matter of surprise, the next ground upon which a new trial was sought.

There is a paper in the record commencing "Lewis G. Scheiffer, one of the above plaintiffs, being duly sworn, says," and ends by the signature of Lewis G. Scheiffer without any jurat or any evidence that any oath was taken. Be-

low this paper, thus signed, is a statement that Scheiffer was known to E. R. Powers, a notary public of New York, and that he acknowledged that the above is his signature. The statements of Scheiffer in this paper deny specifically the testimony of Lewis, deny his agency, or that he made such statements to Lewis as Lewis stated he did in his testimony. There is no file mark on this paper, but the statement seems to have been signed on the 17th of August, 1876, while the motion for a new trial was made June 1, 1876, and was overruled March 30, 1877.

This paper is nothing more than a statement of the plaintiff (not sworn to) that he did not make the statements to a witness for the defendant which that person alleged under oath he did make. This is no showing for a new trial on the ground of surprise. The rule is, that facts alleged in support of such a motion must at least be sworn to or supported by authentic documentary evidence showing merits. The mere statement of the party applying for a new trial is never sufficient.

The only remaining ground for a new trial brought to our attention by the record is the alleged misconduct of the jury. This is based upon several affidavits in the record. The first is the affidavit of J. P. Coker, plaintiff, to the effect that he is informed and believes that many of the jurors say they did not render their verdict upon the evidence in the case, but upon the charge of the court; that he is informed that Jerry Pope, one of the jurors who set in the case, was driven to find the verdict he did through intimidation, fear, and by undue influence, by insinuating that he was bribed, and by cursing him indirectly and abusing him for differing with them; and that he is informed and believes that some of the jurors who tried the case were influenced to find the verdict through prejudice, passion, and other motives that should not have controlled them; that B. F. Barnes, one of the jurors, gave evidence in the jury-room to the effect that

the affiant had been bought out at Greenwood several years ago by parties to get clear of him, to let him leave there, thus intending to influence the minds of the jurors improperly; that he is informed and believes that J. W. Mitchell, one of the jurors, was prompted, through prejudice and passion, to find a verdict for defendant; that said juror was prejudiced against J. F. McClellan, one of his attorneys, and was heard to say, while sitting upon this case, that he was going back to the court-house to hear old McClellan lie some more in that case, meaning this case; that to find a verdict for plaintiff would be imposing upon farmers, and that would never do; that it was not right to give a farmer's work to a merchant; that he was heard to say, while sitting in the cause, that he was not under oath not to talk about the case, " that he had done passed his opinion about the cotton; that he was not going to find for merchants to buy cotton from planters and carry it off to them Northern folks; that he is informed and believes that Mitchell violated the instructions of the court, not to talk about the case, by talking to one Walter Bryan about the case while dispersed under instructions."

Beverly Baker swears that he heard Mitchell use the remark as to J. F. McClellan.

Pope, one of the jurors, swears that he did not assent to the verdict because he was satisfied that the evidence under the charge of the court warranted it, but because of the discontent of many of the jurors at his not agreeing with them, and because several of the jurors cursed around and abused him, and because they signified he was bribed not to agree with them; that for these reasons, and the additional one that he was the only one hanging the jury, he finally consented to the verdict rendered; that B. F. Barnes, one of the jurors, gave evidence in the jury-room against J. P. Coker's character, by stating he had been bought out at Greenwood several years ago by citizens there in order to

get clear of him; and also that he and J. W. Mitchell said to find a verdict for plaintiffs would be imposing upon farmers, and that would never do, that it was not right to give a farmer's work to a merchant.

Ely swears also that he heard Mitchell make the statement as to plaintiff's counsel. Fuller Bellamy swears that he heard Mitchell say that he was not under any oath not to talk about the case; that he had done passed his opinion about the cotton; that he was not going to find for merchants to buy cotton from planters and carry it off to those Northern folks.

Mitchell himself, in reply to this, swears that all the statements sworn to by Fuller Bellamy are false and untrue; that he never said to Bryan what Fuller states he did say; and Bryan himself swears that Mitchell made no such statement to him. Mitchell swears further that he has no prejudice against plaintiff's counsel, and that while he did make the remarks stated, yet that it was in fun and joke, as he has often done about other attorneys, and that he rendered his verdict upon the law and the evidence.

As to the affidavit of the plaintiff Coker. In no State can we find that the affidavit of a plaintiff, upon information and belief (which, as a matter of course, must be derived from the jury,) as to acts of the jury of the character here disclosed, is sufficient upon which to base a motion for new trial. There are few, if any, unsuccessful plaintiffs who will not swear to a belief that a jury acted from prejudice or passion, or some other improper motive, and to make such statements effective for such a purpose would be to have new trials in all cases where plaintiffs are confident of the clear justice of their cause; for in the degree, and to the extent that they believe they are right, it is natural for them to believe that those who find and say otherwise are controlled by some other motive than a just and proper regard to the law and the evidence.

It is apparent from the affidavits of the jurors filed with this general affidavit of the party that the statements in the general affidavit are based upon those made by the jurors themselves. So far as Mitchell's statement concerning plaintiff's counsel is concerned, Mitchell himself explains it. He says it was a mere jest, a joke, a remark he frequently made as to other attorneys. This juror also swears that he made no such statements as to finding against farmers as were attributed to him, and the affidavit of Bellamy is met by the affidavit of Bryan. Unless there is something in the affidavit of Pope, there is nothing in any of the others to justify setting aside this verdict. Pope says he did not assent to the verdict because he thought it warranted by the law and the evidence, but because of the discontent of many of the jurors at his not agreeing with them; that several of the jurors cursed around and about him, and signified he was bribed not to agree with them; that for these reasons, and the additional one that he was the only one hanging the jury, he finally consented to the verdict rendered. Is the affidavit of this juror to be received to impeach his verdict? In the case of Grinnel vs. Phillips, (1 Mass., 542,) where the juror swore that in his mind he had never approved the verdict, or consented to it, Sewall, J., said: "As to this point the witness is not to be believed or heard. The record of a verdict implies a unanimous consent of the jury, and is conclusive and incontrovertible evidence of the fact." There can be no doubt upon this general question. (Salk., 645; 1 T. R., 11; 2 id., 281; 4 Bos. & Pul., 326; 4 John., 487; 5 Hill, 560; 12 How. Pr., 428; 5 Dev., 367; 12 Kan., 539; 48 Cal., 85; 37 Iowa, 339.) It is needless to discuss the reasons for the rule. The oath of a juror is not admissible to impeach his verdict.

In a recent case in the Supreme Court of Massachusetts, (107 Mass., 461,) the English and many of the American cases are reviewed. The court there say: "We have not

found in England any case since the beginning of this century in which, after the return and affirmance of a verdict in open court, the testimony of jurors to the motives and influence by which their deliberations were governed, has been admitted."

This disposes of all the questions presented by this record, all of which have received careful attention and consideration.

The judgment is affirmed..