JAMES M. KELLY, PLAINTIFF IN ERROR, VS. THE STATE OF FLORIDA, DEFENDANT IN ERROR.

1. Where the defendant in a criminal case moves for a new trial upon the ground that a juror who tried him was biased against him and entertained a previously formed opinion of defendant's guilt when taken upon the panel, it must be shown by affidavit that the defendant and his counsel did not know these facts at the time the juror was empannelled.

2. A juror can not impeach his own verdict by testifying as to the motives and influences by which the deliberations of the jury were governed; nor that he entertained a previously formed opinion at the time of the trial; neither can his declarations made after the trial impeaching his verdict be proven by a third person.

3. The incompetency that will authorize the court below to interfere after a juror has been sworn, must be of such a character as would defeat a fair and impartial trial,

4. The premeditated design which is essential to make out a case of murder in the first degree is a question of fact for the jury to determine from the evidence.

5. This court will not reverse the decision of a trial court in refusing a new trial on the ground that the verdict is contrary to the evidence, unless the preponderance or want of evidence is such that the verdict must have been produced by considerations other than a due respect to the evidence.

Writ of Error to the Circuit Court for Duval county.

### STATEMENT.

The plaintiff in error was convicted of murder at the spring term, 1896, Circuit Court of Duval county, and sentenced to death, from which this writ of error was sued out.

Hugh McFarland testified that he was a brother-in-law of John B. Tallant, the deceased; that witness came to Jacksonville December 29, 1895, and found Tallant at St. Luke's Hospital, where witness remained with him continuously until January 25, 1896, when, with the permission of the attending physician, he carried Tallant to St. Louis, Missouri, where he died on January 29, 1896. When witness came to Jacksonville, Tallant was suffering from bullet wounds in the back and leg; Dr. Miller told witness it would be safe for him to remove Tallant; that his condition was hopeless, and death but a question of time, and that the trip would not affect him. Tallant was carried to St. Louis, so that he could die among his people, as they were too poor to come to Jacksonville.

Dr. Miller testified that he and Dr. Romero attended Tallant while at St. Luke's hospital, where he was brought on the evening of December 25, 1895. Tallant was shot from a 38-calibre pistol, the bullet striking on the right of the spinal column, and had either shattered or severed the spinal chord; from the waist down Tallant was totally paralyzed, unable to have an action either from the bowels or bladder, in which condition he remained continually until he left for St. Louis. Witness considered the wound absolutely fatal, and Tallant's death a question of time only. Witness gave Mr. McFarland permission to move Tallant, because he considered that the trip to St. Louis could have no possible effect on the ultimate result of the wound, as Tallant was bound to die from it. Dr. Romero, Dr. Fernandez and witness held a consultation as to the advisability of performing an operation, and all decided it would be useless. Tallant was also suffering from a bullet wound in the leg, which ranged upwards, as if he was down when shot, and the person who shot him stood above him.

Dr. Romero testified that he was among the first to reach Tallant after the shooting, found him in Bettelini's Bicycle Agency, on Bridge street, Jacksonville, lying just inside the door, with his feet almost at the threshold, and his head towards the back of the store. Tallant was shot in the back, and by probing he found that the spinal chord was either partially or totally severed; also found a wound in the leg, ranging upward, as if the leg was up when shot, and, in the opinion of witness, Tallant was down when shot in the leg. Witness found a knife containing one broken blade in Tallant's pocket. Tallant was sent to St. Luke's hospital. This occurred on the evening of De-

cember 25, 1895. Tallant was totally paralyzed from his waist down, and remained in that condition constantly until sent to St. Louis. In witness' opinion the wound in the back was absolutely fatal, and death its inevitable consequence. Witness, Dr. Miller and Dr. Fernandez made a thorough examination of the wound, but decided that an operation would be useless. Witness knew of no case of recovery from wounds of like character. Witness considered that the trip to St. Louis had no effect whatever in hastening death. In witness' opinion Tallant was shot in the back first, and afterwards in the leg. The wound in the leg could, from the range of the bullet, have been made by a man who was below Tallant and shot up, or it could have been made with like range of bullet if Tallant had whirled when the shot was fired.

Dr. Fernandez testified that he was a physician and surgeon; that he was called in by Drs. Miller and Romero a few days after Tallant was shot to examine the wound in the back, to determine whether it was advisable to perform an operation. Witness thoroughly probed the wound, and found that the spinal chord was severed; that death was inevitable and the operation useless. Tallant was totally paralyzed from his waist down; his death was a question of time. Tallant might have lived a month, three months, six months, a year or indefinitely; but sooner or later that wound would have killed him; that in his opinion the trip to St. Louis had no effect in hastening Tallant's death.

George Adams testified that he witnessed the shooting of John B. Tallant, which occurred about 6 o'clock on December 25, 1895; it was just getting dark; witness was inside Bettelini's Cycle Agency, on Bridge

street, Jacksonville, Duval county, Florida. Witness'
attention was attracted by two men wrestling on the
sidewalk in front of the front door of the agency.
Witness ran to the door and saw them as they fell on
the sidewalk, Tallant on top, Kelly underneath. Some
men pulled them apart, and as they got up Kelly
pulled out his pistol and struck Tallant with it on the
head; Tallant struck Kelly with his fist and Kelly
staggered on the sidewalk, and after steadying him-
self fired at Tallant, but witness does not think this
shot hit any one. Tallant then started toward the
door of the bicycle store, and as he reached it, with
his back toward Kelly, the latter fired again, and Tal-
lant fell inside the store, with his feet just clearing
the threshold; then Kelly stepped to the door, put his
pistol just inside the door, bent over Tallant and fired
three more times. Witness saw Tallant's hands
throughout the difficulty, and he had nothing in them.
Witness saw no knife except the one found in Tal-
lant's pocket, and he did not move Tallant until Dr.
Romero came. There was an electric light in the bi-
cycle agency.

M. F. Brunson testified that he was standing across
the street from Bettellini's bicycle store on the even-
ing of December 25, 1895; that he saw two men appa-
rently wrestling, fall on the sidewalk, Kelly under-
neath Tallant; some men pulled them apart and as
they got up Kelly pulled out a pistol and struck Tal-
lant on the side of the head; Tallant struck Kelly in
the face with his fist hard enough to knock him off the
sidewalk, and as Kelly got up he fired twice, when
Tallant fell at the door of the store; Kelly then ran
forward and fired three more times; witness could see
Tallant's hands; he had nothing in them.

Jack Rowan testified that he was present, standing on the sidewalk at the time of the difficulty; that Tallant was standing by the post with his hands by his side; Tallant had no knife; Tallant and Kelly had some words and they clinched and fell on the sidewalk, with Tallant on top; some one parted them, and as they got up Kelly pulled out a pistol and struck Tallant on the head with it; Tallant struck Kelly with his fist hard enough to shove him off the sidewalk; and as Kelly got up he fired at Tallant who was walking away from the door of the Bettellini's Bicycle Agency; at the second shot Tallant fell; and Kelly rushing to him, fired three more times.

The defendant testified that he was a policeman of the city of Jacksonville on December 25, 1895; that under the rules of the police department then in force a policeman was always on duty whether in dress or undress uniform; that it was the duty of a policeman to prevent violations of city ordinances when off, as well as when on, active duty. The rule of the police department referred to by the defendant was read in evidence as follows: "Each member of the force shall be deemed to be always on duty, subject to such relief therefrom as shall be allowed by proper authority, and the same responsibility as to suppression of disturbances and the arrest of offenders rest upon them, when not in uniform as when in uniform on post of duty." Defendant further testified that about dark on December 25, 1895, he was walking north on Bridge street, two ladies were walking behind him; the sidewalk in front was blockaded by Tallant and others whom he afterwards found out were Tallant's friends; it was impossible to pass and defendant said to them "clear the sidewalk, gentlemen, and let the ladies

pass." Tallant and his friends laughed and Tallant said ":ladies, hell," but none of them moved; defendant started to lay his hand on Tallant's shoulder to arrest him for obstructing the sidewalk when Tallant suddenly wheeled and struck defendant full in the face; defendant and Tallant clinched; Tallant's friends gathered round them and shoved defendant on the sides, and Tallant threw defendant down; if Tallant's friends had not helped him, he never could have thrown defendant down by himself; as defendant fell his coat flew open and exposed his policeman's badge which was pinned on defendant's left breast; one of Tallant's friends said "look out Jack, he is a damned cop;" Tallant answered, "I don't care a damn, I'll cut the s— of a b—— head off." Some one pulled Tallant off defendant; as defendant rose off the sidewalk one of Tallant's friends kicked defendant in the side; defendant pulled out his pistol and struck Tallant on the side of the head, but Tallant held off and struck defendant with his fist closed, and Tallant had something in his hand which defendant believed was a knife; Tallant struck defendant with such force as to knock him off the sidewalk; as defendant staggered to his feet he saw one of Tallant's friends throw his hand in his hip-pocket, and another in his inside coat pocket; defendant believed they were armed. Defendant was crowded around and believed his life to be in iminent danger; defendant then immediately fired as rapidly as he could pull the trigger; to the best of defendant's knowledge he fired only three times; as he fired the second time some one pushed up his arm and the shot went higher than defendant intended, presumably striking Tallant in the back, as defendant did not want to kill Tallant and purposely aimed low to disable him;

as defendant felt some one shove his arm he turned his head quickly and fired at Tallant without looking at him; when defendant looked back and saw Tallant was down defendant ceased firing. Defendant was sorry Tallant brought upon defendant the necessity of firing upon him, but defendant believed under the circumstance the jury or any one else, would have done the same thing.

Defendant produced George V. Burbridge, who testified that he was one of the police commissioners of the city of Jacksonville on December 28, 1895; that Kelly was at that time a member of the police force; that the rule introduced in evidence was in force on December 25, 1895.

Defendant produced Abe Rippa, who testified that about dusk on Christmas day 1895, his mother and sister were walking with him on Bridge street, going north "just this side of Bettelini's Bicycle Agency," and found the sidewalk blocked by some men. Defendant, who was in front of witness, asked the men to clear the sidewalk so that witness and his companions could pass; they did not do so at once, but finally Kelly made them part so that witness and his companions did pass; witness and his companions went right on and saw nothing of the difficulty.

Defendant produced Mr. Dillaway who testified that he got to Tallant immediately after the shooting. This was all the evidence upon the trial.

The defendant moved for a new trial on the grounds: 1st. The verdict is against the evidence, the law and the charge of the court. 2d. One F. S. McLeary, one of the trial jurors, was incompetent and disqualified to serve on the jury as appears by affidavit on file.

9

The affidavit referred to was by A. M. Michelson, defendant's attorney, to the effect that he had a conversation with McLeary, within an hour of the rendition of the verdict, at the bar room of August Blum on Bridge street, in which conversation McLeary informed affiant that defendant had already killed one man in South Carolina, and was now wanted in the State of Georgia for murder; that these facts were known to McLeary prior to his being summoned as a juror in the case. That McLeary had a conversation with J. C. Turner in August Blum's bar room on the night prior to the trial of the case, stating facts in relation thereto; that in fact McLeary could himself be a witness in said case if he wanted to as he was in a few feet from the alleged homicide at the time of its commission, viz: at Laco's fruit stand on Bridge street; that August Blum heard McLeary acknowledge the fact of his being a witness to the homicide, and did say so to affiant; and Turner acknowledged to affiant having had such conversation with McLeary, but Blum and Turner declined to make affidavits to that effect, unless summoned to court by due process of law; that affiant could not discover said facts by the exercise of any dilligence prior to the trial of the case, and did discover same by pure accident. Upon the hearing of this motion the court called August Blum, who testified that he had a conversation with McLeary within a short time after the verdict was rendered in the Kelly case; that McLeary told witness he was called as a juror and could have been a witness if he wanted to, as he was within two hundred yards of Bittelini's Cycle Agency at the time of the shooting.

The court also called J. C. Turner, who testified that

he had a conversation with McLeary a day or two before Kelly's trial. McLeary told witness Kelly had already killed one man in South Carolina, and was then wanted in another State for killing some one else; also that at the time of the shooting he was near Bettelini's Bicycle Agency; witness is "pretty confident" he said Laco's fruit stand.

The defendant produced A. M. Michelson, who testified that he met McLeary within an hour after the verdict in the Kelly case, in the doorway of August Blum's bar, talking to McFarland, Tallant's brother-in-law; McLeary looked as if he had a drink or two, in fact witness had never known McLeary to be perfectly sober; so was witness. McLeary said "that s— of a b—," referring to Kelly, "ought to hang;" that he had killed a man in South Carolina, and was then wanted somewhere, witness thinks he said in Georgia, for killing another man. McLeary said he knew all this the very day Kelly shot Tallant, and that the night before the trial he had a conversation with J. C. Turner in Blum's barroom with reference to the facts and circumstances connected with the killing of Tallant; that when the jury retired to consider their verdict the first ballot stood eleven guilty, one not guilty, that thereupon McLeary picked up the ballot of not guilty and said, "Who in h— wrote that ballot?" and that some cracker in the linen coat whom Michelson had charmed said, "I put that ballot in, but did it only for argument;" that McLeary then said, 'You damn fool you, we don't want any argument here; Mr. Clerk, prepare another ballot," and it was done. This witness further testified that Turner and Blum both assert that they learned all these facts from McLeary, but did not for personal reasons care to make

voluntary affidavit; consequently affiant requested the court to summon them.

F. S. McLeary, on behalf of the State, testified that if he ever told any one that he was at Laco's fruit stand at the time of the shooting of Tallant he did not remember. Witness lived at the corner of Adams and Davis streets, just four and one-half blocks from Bettelini's Cycle Agency, and was there at the time of the shooting. This witness was not examined as to any conversation with A. M. Michelson or August Blum.

Mr. Rowan, on behalf of the State, testified that he was on the jury with McLeary in the Kelly case; that the first ballot stood eleven to one for conviction, and the gentleman who cast the one ballot did say that he cast it to bring about argument; but nothing like what Michelson said took place in the jury room, and certainly no cursing. McLeary had nothing to say to the juror. Nothing was said in the jury room except in regard to the crime on which defendant was being tried.

The record, after setting forth the language of the motion for new trial, contains this language: "Which said motion being considered by the court, an order overruling and denying said motion in the words and figures following was made: 'After investigation by the court of the second ground, and the hearing of witnesses thereto, the motion is denied, and exception noted; R. M. Call, Judge.'" The bill of exceptions states that a motion for new trial was made, stating the grounds as already set forth in this statement of facts; that the motion came on to be heard and evidence was introduced, "and thereupon the court did consider and decide that said motion should not be

granted, to which decision the defendant by his coun-sel did then and there except."

The errors assigned in this court are: 1. The ver-dict of the jury was against the evidence. 2. The ver-dict of the jury was contrary to law. 3. The court below erred in denying the motion for a new trial. 4. The court erred in ignoring the first ground of the motion for a new trial and in omitting and failing to make any decision upon the same.

The charge of the court is not incorporated into the record.

The other facts in the case are stated in the opinion of the court.

*A. M. Michelson*, for Plaintiff in Error.

*The Attorney-General*, for Defendant in Error.

CARTER, J.:

There is nothing in the fourth assignment of error. The record shows that the *motion* for a new trial, not the *second ground* of the motion, as contended by plaintiff in error, was denied. The bill of exceptions also shows that the *motion* was overruled. Upon a fair interpretation of the statements in the record proper and the bill of exceptions, it appears that the court investigated certain facts which were applicable only to the second ground, and thereupon denied the motion for a new trial generally.

The third assignment of error questions the correct-ness of the ruling of the Circuit Court denying the motion for a new trial. The second ground of this motion relates to the alleged disqualification of the

juror McLeary, because of bias, and because of a pre-
viously formed opinion.    This motion was properly
overruled, because upon an application of this kind
the law requires an affidavit that the *defendant* and
his *counsel* did not know at the time the juror was em-
panelled, that he was prejudiced against defendant,
or had formed or expressed an opinion as to the de-
fendant's guilt.    In this case there was an affidavit
from defendant's counsel only, and it was nowhere al
leged that the defendant had no knowledge of the dis-
qualification of the juror before he was sworn.    Mor-
rison vs. McKinnon, 12 Fla. 552; Irvin vs. State, 19
Fla. 872; Anderson vs. State, 14 Ga. 709; Booby vs.
State, 4 Yerger (Tenn.), 111; Achey vs. State, 64 Ind.
56; Clough vs. State, 7 Neb. 320; Brown vs. State, 60
Miss. 447; State vs. Tuller, 34 Conn. 280; Thompson
& Merriam on Juries, page 304; Rapalje's Criminal
Procedure, sec. 211.    The testimony of August Blum
and A. M. Michelson and the affidavit of Michelson,
being confined entirely to alleged declarations of the
juror after the verdict, were not competent evidence.
No rule is better settled than that which forbids a
juror to impeach his own verdict by testimony as to
the motives and influences by which the deliberations
of the jury were governed.    Coker & Scheiffer vs.
Hayes, 16 Fla. 368; Godwin vs. Bryan, 16 Fla. 396;
McMurray & Brittain vs. Basnett, 18 Fla. 609; Thomp-
son & Merriam on Juries, sec. 440.    A juror will not
be permitted to impeach his own verdict by an affidavit
made after the verdict that he had formed and ex-
pressed an opinion, before the trial.    1 Bishop's
Criminal Procedure sec. 1270; People vs. Baker, 1
Cal. 403.    Neither can the declarations of a juror
after trial, impeaching his verdict, be proven by a

third person, on a motion for a new trial.   1 Bishop's Criminal Procedure, section 1270; Thompson & Merriam on Juries, sec. 445; Godwin vs. Bryan, 16 Fla. 396; 2 Thompson on Trials, 2622.

The testimony of J. C. Turner was clearly insufficient to disqualify McLeary as a juror. It does not show that McLeary witnessed any part of the difficulty between Kelly and Tallant.   McLeary may have been at Laco's fruit stand near Bettelini's Bicycle Agency at the time of the shooting, and might have known that defendant had already killed one man in South Carolina, and was then wanted in some other State for killing another, and yet he may have had no bias or prejudice against defendant; nor have ever formed or expressed any opinion as to his guilt or innocence of the crime for which he was then being tried.   "The incompetency that will authorize the court below to interfere after a juror has been sworn, must be of such a character as would defeat a fair and impartial trial." State vs. Madoil, 12 Fla. 151.

The first and second assignments of error, and the remaining ground of the motion for a new trial, are identical, except that the motion for new trial complains that the verdict is contrary to the charge of the court.   As the charge of the court is not brought up in the record, we are unable to consider this question. It is insisted under the first and second assignments of error that the proof was insufficient to show beyond a reasonable doubt that Tallant came to his death from the effects of the wounds inflicted upon him by defendant; and to show premeditation on the part of defendant.   It is also insisted that defendant should have been acquited on the ground of self-defense. These were questions for the jury to determine from

the evidence, and we must accept its finding as conclusive, unless the preponderance or want of evidence is such that the verdict must have been produced by considerations other than a due respect to the evidence. Dukes vs. State, 14 Fla. 499; Savage and James vs. State, 18 Fla. 909; Irvin vs. State, 19 Fla. 872; Carter vs. State, 22 Fla. 553; Hicks vs. State, 25 Fla. 535; 6 South. Rep. 441; Yates vs. State, 26 Fla. 484, 7 South. Rep. 880; Baker vs. State, 30 Fla. 41, 11 South. Rep. 492; Wescott vs. State, 31 Fla. 458, 12 South. Rep. 846.

In the case of Wescott vs. State, 31 Fla., text pages 470, 471, this court said: "That the accused caused the death of the deceased, * * is shown beyond all reasonable doubt; and the only possible question that can arise on the testimony is whether or not the killing was done with a premeditated design to effect the death of the deceased. The premeditated design which is essential to make out a case of murder in the first degree is a question of fact for the jury, and in the present case it was properly submitted to them, and found against the accused. * * * The killing was unnecessary and unjustifiable and was the result of the defendant's own wrong." This quotation is applicable to the facts of this case. According to the testimony of the defendant it might be contended that there was no premeditation, but his version of the affair is not borne out by the testimony of any other witness. According to the testimony of Abe Rippa, one of defendant's witnesses, the difficulty did not occur in any effort on the part of defendant to clear the sidewalk for Rippa's mother and sister to pass, as claimed by defendant, but occurred after Rippa and his mother and sister had passed, and gone such a dis-

# JANUARY TERM, 1897. 137

tance that they saw none of the difficulty. If, as claimed by defendant, the threatening gestures and attitudes assumed by Tallant's *friends* induced him to believe his life in danger, it is very strange that instead of directing his fire at them after the second shot, he should have walked up to the prostrate form of deceased and fired three more shots at him. The claim of defendant that he had no desire to kill the deceased, but only to disable him, is fully answered by his conduct in deliberately emptying his pistol at deceased after he was entirely disabled. Giving to the finding of the jury the weight which the law requires, we are unable to say that the evidence did not justify the verdict, and the judgment of the court below is affirmed.