J. W. BUCHANAN, *Plaintiff in Error*, v. THE STATE OF FLORIDA, *Defendant in Error*.

Division A.

Opinion Filed February 22, 1928.

*Davis & Pepper,* for Plaintiff in Error;

*Fred H. Davis,* Attorney General, and *H. E. Carter,* Assistant, for the State.

ELLIS, C. J.—The plaintiff in error was indicted for the murder of J. P. Brandt in Taylor County on December 6, 1926. The indictment was filed in January, 1927. The accused was convicted of murder in the first degree with recommendation to mercy and was sentenced to life imprisonment in the State prison. He seeks a reversal of the judgment on writ of error.

The facts, which the record fully supports, are in substance as follows:

Buchanan, hereinafter referred to as the defendant, lived with his wife in a four-room cottage about fourteen miles from the city of Perry in Taylor County. On the 6th of December, 1926, early during the morning the defendant left his home with a friend, who had called for him in the

latter's automobile, on a proposed deer hunt. Their arrangements for the hunt were not carried out owing to the failure of one other, who was to have been a member of the party, to meet them at the point of rendezvous, and they returned to the Buchanan home about half past ten o'clock in the forenoon. Buchanan and his friend, whose name was D. W. Blue, went into the house on Buchanan's invitation, who requested his wife to prepare a lunch for himself and friend as they were going squirrel hunting, the deer hunt for the day having been abandoned.

Mrs. Buchanan, Blue and a small boy, Orin McDaniel, who was there, went into the kitchen which was located to the south of and adjoining the west room of the house through which they had passed in going into the kitchen. The defendant, according to his statement, remained in the west room selecting shells for the guns to be used in the proposed squirrel hunt. Mrs. Buchanan was preparing the lunch; Blue was bathing his face and hands and Buchanan was standing near the door between the main room and the kitchen, when two men, J. P. Brandt and W. C. Mobray, arrived in an automobile at the front gate of the yard, defined by a picket fence surrounding the house. They sounded the automobile horn and Buchanan went out to meet them. He traversed the space between the front porch of the house and gate, about twenty-five feet, and passed out of the gate to where the automobile was. It had apparently come from a point eastward to the house and had stopped in front of the gate as if going in a south-westerly direction. The defendant talked with the man at the wheel of the automobile and invited him and his companion into the house. The three arriving at the porch or veranda which extended across the entire front of the house which faced north toward the front gate, Buchanan stated to them that he would tell his wife of their presence.

From this point the State's case as to what occurred, except that the two men, Mobray and Brandt, were killed by Buchanan, depends on circumstantial evidence. The question whether in killing Brandt, one of the men, for whose murder Buchanan was tried and convicted, the latter acted unlawfully and from a premeditated design can be determined only from the circumstances.

The two men who were killed were internal revenue officers working under a superior and upon his directions. The latter's name was J. H. Lee. He said that the position he held was that of "Deputy Prohibition Administrator of the State of Florida." The evidence tends to support the fact that both men, Mobray and Brandt, were armed with pistols when they arrived at the Buchanan home; that Buchanan was not armed when he went out to their automobile and invited them to the house, but that he had several rifles, shotguns and pistols in the house. The shotguns and pistols seem to have been loaded at the time.

The house is a three or four room cottage. The north side of it is the front side, across which the porch extends the entire width. A partition runs through the house from the north to the south dividing it into two rooms. Two doors open from the porch to the two rooms respectively. One door to the west, the other to the east of the partition. It was in the west room that Buchanan kept his rifles, pistols and shotguns. The pistols were lying on a bureau, or some such article of furniture, located near the porch door on the east side of the room. The shotguns and rifles were near the southeast corner of the room against the partition. The automatic shotgun, the one which the defendant used during the transaction, may have been near the bureau or "dresser."

The defense was: "self-defense" or justification. The

defendant testified that the reason he shot Brandt was that "he started to shoot me first and I had to shoot him for my own protection." If the killing of the two men occurred under the circumstances related by the defendant the verdict of murder was incorrect. The case of the State was made out if at all before Buchanan testified. He was the last witness called.

If the evidence adduced at the trial before the defendant testified was insufficient to show that Buchanan's action in shooting Brandt was unlawful and from a premeditated design to kill him, or some other person, his testimony was unnecessary as that burden rested upon the State. We discover nothing in the testimony of the defendant which in any degree gives support to the State's case, unless his evidence is inherently illogical or unsound.

The unlawful and premeditated qualities of Buchanan's act in killing Brandt, therefore, must be found in the facts, the circumstances revealed by the testimony of witnesses and other evidence adduced prior to the defendant's testimony.

Those circumstances, which the jury were amply justified from the evidence in accepting as true, were in substance as follows: Mobray and Brandt were Federal Revenue officers. They went to the defendant's house for the purpose of searching it for alcoholic liquors; that upon arriving at the house they notified the defendant of their presence and purpose. The defendant, upon being informed of their purpose, invited them to the house. In company of the defendant they came to the house and entered the porch or veranda. Mobray at that time took into his hand a pouch of tobacco and began filling a pipe which he intended to smoke. He had a match in his hand with which he intended to light the tobacco; this pouch of tobacco was shot from his hand by Buchanan and fell upon the floor

of the porch, scattering tobacco upon it. Mobray fell mortally wounded at the northeast corner of the yard, where he had retreated about twenty-five feet from the house.

Brandt's body was found under the porch westward of the steps lying upon the left side, his head under the main body of the house and his body and legs under the porch, his feet about three or four feet from the edge. Brandt's body had many wounds in it; one in the left shoulder made by a steel jacketed bullet, which ranged through the body and was cut from the body by Dr. Green in "front of the clavicle on the left side." One of the defendant's pistols, according to his statement, carried that kind of a bullet and he emptied that pistol in shooting at the two men before using the shotgun, the shells of which were loaded with "buckshot." Brandt was struck with a load of buckshot in the upper abdomen; one shot "came out to the left of the right nipple," two went in the "umbilical and came out below the left nipple." Wadding was embedded in some of the wounds to a depth of four or five inches. He was struck with buckshot in the legs and on the "left thigh, in the upper third of the left thigh." That wound ranged upward and the shot came out at the left hip joint. He had powder burns on his hand.

A chart or diagram of all these wounds was made by a witness, which diagram was held in his hand as he testified. That diagram was not included in the bill of exceptions; it appears not to have been introduced in evidence. As the verbal description of the wounds by the doctor made the inference reasonable that the man was shot first with a pistol in the left shoulder, the bullet cutting through the body to the left nipple, and afterwards with a shotgun loaded with buckshot when he was lying down and seeking shelter under the house, it is presumed that the testimony of other witnesses, including the one who had the chart

and who spoke of wounds being made by bullets which entered "here and came out there" and such other indefinite descriptions, confirmed the deduction. This is true because the burden is upon the plaintiff in error to make the error, if any, clearly to appear. See Tatum v. State, 49 Fla. 67, 38 South. Rep. 601; Waldo v. State, 58 Fla. 133, 50 South. Rep. 487; Houston v. State, 50 Fla. 90, 39 South. Rep. 468; McRae v. State, 62 Fla. 74, 57 South. Rep. 348.

These circumstances justify the conclusion at which the jury arrived that the assault by the defendant was unlawful. There is ample evidence to support the fact of premeditation. The deliberate use of deadly weapons and all the circumstances of the case. Odom v. State, 51 Fla. 91, 40 South. Rep. 182; Adams v. State, 28 Fla. 511, 10 South. Rep. 106; Kelly v. State, 39 Fla. 122, 22 South. Rep. 303; Phillips v. State, 88 Fla. 117, 101 South. Rep. 204.

Whether a homicide was committed with premeditated design to kill or in a sudden paroxysm of passion is for the jury to determine from the evidence on this point, who are also the judges of the credibility and weight of the evidence. While premeditation involves a prior intention to do the act in question it is not necessary that the intention should have been conceived for any particular period of time. "It is as much premeditation if it entered into the mind of the guilty agent a moment before the act as if it entered years before." See Barnhill v. State, 56 Fla. 16, 48 South. Rep. 251; Lowe v. State, 90 Fla. 255, 105 South. Rep. 829; Wise v. State, 69 Fla. 260, 67 South. Rep. 871.

The testimony of Asa Mathews was not inconsistent with the idea of an unlawful assault by the defendant. In answer to the question: "Did you see the shooting?" he replied: "I saw the man with the hat on shoot Mr. Buck." He testified that he saw the two men standing on the

porch; that the thing "which first attracted his attention was the shooting"; he then saw the man "shoot Mr. Buck," whom the witness could not see. He afterwards said, in reply to a leading question from the court, that that shot was the first one he heard. If the latter statement was true it follows that it was not the shooting which caused him to "look up" and which first attracted his attention. The testimony of that witness is consistent with the fact that Buchanan began the shooting at the man who held the pipe and smoking tobacco in his hand, Mobray, and that Brandt replied by a shot at the defendant.

As against the logic of these circumstances is opposed the testimony of the defendant who said that Mobray and Brandt arrived at his front gate in an automobile; sounded the horn which notified him of their presence; that he went out to ascertain their wishes. They told him that it had been reported to them that he had been selling "shine" and that they wanted to see and that they "were going to search your (his) house." His reply was: "Is that so, you are?" And they said: "Yes." He then said: "All right you are welcome to search it." The men then got out of the car and walked with Buchanan to the house. The one who wore a cap held the screen door, and the other walked up "sorter to the north of the house." That statement is unintelligible because at that time all of them were north of the house—unless the defendant had already entered.

Buchanan then said: "Gentlemen, just wait here a minute and let me call my wife." At that moment, according to Mathews, both men were standing on the porch. Then, according to Buchanan, "this one to my left said: 'No, by God, we are going in now.'" Buchanan then "looked around" and saw that the one who had spoken had his pistol. Then Buchanan "turned around to the one

that had hold of the screen door, and said, 'Wait a minute, gentlemen.'" Then the one at the screen door said "Don't shoot." Then Buchanan said that caused him to look and the one with the cap on "throwed his pistol that way at my head (indicating), and when I saw that, I jumped back inside the door, and the pistol fired." Buchanan then "reached back to the dresser," got his pistol, and "stepped back to look." The man took another shot and Buchanan fired at the same time. Now, Brandt's clothing that he wore at the time he was killed was submitted in evidence. No description of that clothing is contained in the bill of exceptions but the clothing presumably that of Brandt was sent here under the rule. There are, however, no identification marks upon it. If it was Brandt who wore the hat, then the statement of Buchanan is self-convicting. If, on the other hand, Brandt wore the cap the statement is unintelligible and contradicts the testimony of Mathews.

We are of the opinion that the evidence amply supported the verdict; so the first assignment of error is not well taken.

The defendant requested the court to give the following instruction:

"The court charges you gentlemen of the jury, that one in defense of his home may use the force necessary for its protection against invasion and harm."

There was no error in the refusal of this charge as it was irrelevant. It had no bearing upon the defense made which was that of defense of the person, and the general charge of the court fully covered that phase of the case.

The second, third, fourth and fifth assignments of error relate to the same matter and present the point made by the above quoted requested instruction.

The sixth, seventh, eighth, ninth, tenth, eleventh, twelfth

and thirteenth assignments of error deal with requested instructions, which were refused, relating to the matter of an attempted search by officers under a search warrant.

The record contains much about search warrants held by one of the two men who were killed. In our view of the case all that was irrelevant. It had no material relation to the offense for which the defendant was put on trial and served no purpose but to encumber the record with useless testimony. The defendant, himself, said that the men told him that they had come to search his house, to which he gave his consent and invited them to come in. See Maldonado v. U. S. 284, Fed. 853; Cooley Const. Line, (8th Ed.) 631. It is true that he asked them to wait until he could inform his wife of their presence, to which they objected, but it was not that objection which precipitated the difficulty. It was, according to the defendant, the assault of one of the men upon the defendant with a deadly weapon which made it necessary to kill them in defense of his person, so he said.

The assignments of error numbered from fourteen to twenty inclusive and from twenty-three to thirty-one inclusive are expressly abandoned by plaintiff in error.

The twenty-first assignment of error attacks the charge given by the court, as follows:

"Gentlemen of the jury, the court charges you that the testimony in this case does not present for your consideration any question of any unlawful trespass or invasion upon or in Mr. Buchanan's home by Brandt or Mobray. On the contrary the defendant testifies that he shot Brandt, not to prevent him from trespassing upon his home, or invading the same but for the reason, and because, as he testifies, that without provocation Brandt started to shoot him and that he, therefore, had to shoot him for his own protection."

There was no error in giving that instruction. The statement that the evidence presented no question of an unlawful trespass or invasion upon or in the home of the defendant was not error. The mere fact that much unnecessary and irrelevant testimony was taken about search warrants supposed to have been held by one of the two men killed did not inject into the case any question of the right of the two men to be where they were when they were killed. They were Federal officers who had appeared at Buchanan's home for the purpose of searching it for alcoholic liquors. The official capacity in which they acted was shown by undenied testimony, although that fact was unnecessary to be established. They made their appearance and purpose known to Buchanan who invited them in and signified his willingness to have his house searched by them. That was all that was necessary to be shown by the prosecution. If when the defense offered its evidence any question of the defense of the defendant's house against unlawful search had appeared then the evidence as to authority under the law supposed to have been held by the two officers would have been proper in rebuttal.

The trial of a person charged with crime, particularly of the higher grade of offenses, may be easily encumbered to the point of confusion and uncertainty as to the real issue by the primary introduction by the State of testimony wholly irrelevant at that stage of the proceedings. It is unnecessary for the State to introduce evidence in anticipation of any particular line of defense the defendant may develop under the plea of not guilty. A prosecution should not proceed upon the theory, that as the case involves the guilt of the defendant for the commission of a high crime, that he had some justifiable reason in law for the act, and then proceed in an attempt to refute that,

often imaginary, fact on which such reason is supposed to rest. The mere fact of the killing of Brandt at the time, in the county, and by the means alleged and the further facts of the nature and character of the wounds upon his body and the place where the body was found, were sufficient to put the defendant to his defense. In the instant case that defense was defense of his person, not his home. He said he killed both men because one of them, the one who wore a "cap," first tried to kill the defendant. It appeared from his testimony that the other was a peacemaker and tried at first to prevent his companion from shooting at the defendant. That person, as there were only two of them, was the one who wore a "hat." So, if it was Brandt who wore the hat, the defendant's statement was self-convicting. There is no merit in that assignment.

The thirty-second and thirty-third assignments of error are abandoned.

The thirty-fourth assignment of error rests upon an exception taken to the following procedure: The veniremen were being examined on their *voir dire;* eleven had been examined and tendered as jurors; the defendant had exhausted four of his ten peremptory challenges allowed by the statute. The defendant, through his counsel, announced that he had no further peremptory challenges to exercise on the jurors then in the box. He was asked by the court if he desired time for a conference to decide whether or not he would have other challenges to make. He replied that he did not. Thereupon the eleven were sworn in chief and the court proceeded to select the twelfth juror who was also tendered, accepted and sworn in chief. Objection was made to this proceeding, but no exception was taken except by inference.

While such procedure was irregular the same was within

the sound judicial discretion of the trial court and no abuse of such discretion has been made to appear even vaguely. See Mathis v. State, 45 Fla. 46, 34 South. Rep. 287.

The thirty-fifth assignment of error undertakes to present a point involving the legality of a question propounded to Doctor Green, who held the autopsy upon the bodies of the two men, Mobray and Brandt. Objection was made to any description of wounds upon the body of Mobray. The objection was overruled upon the State's promise that the testimony would be "connected up." Exception was taken to the ruling. The defendant's testimony sufficiently showed the connection to render the evidence admissible, if there was any harm in it to begin with. There was no specific objection. The objection made merely amounted to an objection that it was immaterial. It was too vague to be considered. See Gantling v. State, 40 Fla. 237, 23 South. Rep. 857.

The necessity for resort to circumstantial evidence was apparent, therefore, an objection that it was irrelevant is not favored. See Volusia County Bank v. Bigelow, 45 Fla. 638, 33 South. Rep. 704.

The killing of Mobray was shown to be part of the *res gestae*, in so far as we understand that term to include everything that happened as part of the transaction investigated. We do not find that any effort was afterward made to strike the testimony. See Miller v. State, 76 Fla. 518, 80 South. Rep. 314.

There is no merit in either the thirty-sixth or thirty-seventh assignment of error. The witness Lee was asked if Brandt, the deceased, had authority to enforce prohibition laws by search and seizure in the Northern Federal District of Florida. The defendant objected to the question and the objection was overruled and exception taken. The

evidence elicited by that question, if it was harmful at the time, was cured by the defendant's testimony which showed its irrelevancy. He, himself, gave consent to the search. The two men, Federal prohibition officers, were therefore upon the premises to search them with the defendant's knowledge and consent.

The thirty-eighth assignment of error involves the same point. The witness Fiveash, who was a member of the coroner's jury, was asked about marks on a rocking-chair he saw on the defendant's porch. Whether the chair was, when he saw it, in the same relative position to the door of the house that it was in when the shooting occurred was a matter affecting the probative force of the fact but objection to its competency was not a valid objection, the fact was a mere circumstance to go to the jury for what it was worth. So there was no merit in the thirty-ninth assignment.

No authority is cited in support of the fortieth assignment of error which rests upon the testimony of the witness Fiveash as to the number of guns and pistols which he saw in the defendant's house when the witness was summoned as a member of the coroner's jury. The argument upon that assignment merely amounts to the assertion which is made in the assignment itself, that the ruling admitting the evidence over defendant's objection was harmful error; so under the rule the assignment may be treated as abandoned. See Ephriam v. State, 82 Fla. 93, 89 South. Rep. 344; Cross v. State, 89 Fla. 212, 103 South. Rep. 636.

We do not agree with counsel that the evidence was irrelevant or inadmissible for other reasons. If the keeping of firearms in one's house is evidence of the bad character of the master of the house it might be argued that the defendant was a man of bad character because he did have firearms in his house, but in view of the legal right which

one has to defend his home against invasions by persons acting unlawfully to the extent of the use of such force as is necessary to repel such invasions and eject the trespassers, the major premise can hardly be admitted. In this case the evidence was proper for more than one reason. It was a circumstance which showed the facilities at hand for immediate use by the defendant of deadly weapons. It may have thrown some light upon the question whether in fact either Brandt or Mobray was armed when they went to the defendant's house; whether the pistols found on the ground near their dead bodies were their pistols or the defendant's. As to the one found near the body of Mobray the evidence is by no means clear that it was his property or that he had been armed with it. It was he who had the pipe and apparently was preparing to light it when the shooting began; his tobacco pouch was found on the veranda; his pipe was lying near his body which was lying about twenty-five feet from the house from which he had retreated, and he held an unlighted match in one of his hands. If he was preparing to smoke his pipe, had filled it with tobacco and had taken a match from his pocket for that purpose still holding the tobacco pouch in one hand, when the shooting began and it was he who wore the cap and according to the defendant fired the first shot and then retreated from the house with his pipe in his mouth a match in one hand and a pistol in the other, he gave at once an exhibition of the most nonchalant cruelty on the one hand and imperturbable bravery on the other most extraordinary, quite to the degree of emphasizing the improbability of the supposition that the pistol found near his body was his property. If it was not, the whole story of the defendant becomes perfectly transparent.

The forty-first assignment of error attacks the correct-

ness of the court's action in calling the witness Dan Blue as the "court's witness" and the forty-eighth assignment presents the contrary proposition; that the court erred because the judge refused under like circumstances to call Orin McDaniel as the court's witness.

In the case of Selph v. State, 22 Fla. 537, the subject was discussed. The matter of calling a witness for whose testimony neither the State nor the defendant is willing to vouch is subsidiary to the point involved in the old common law practice of requiring the prosecutor to prove the entire transaction and all the *res gestae*, thus rendering it necessary to call all the witnesses both for and against the prisoner. The Court, speaking through Mr. Justice McWHORTER, then Chief Justice, said: The practice "must have come into use when, by the English law, the prisoner was not allowed to have counsel to speak in his defense." But the learned Chief Justice pointed out that now no necessity exists for any such practice because the prisoner is entitled to be represented by counsel to advise him, to submit his evidence and argue his case before the jury, and if he desires to do so, he may make a statement under oath. If he is not able to employ counsel the court provides counsel for him. He may have compulsory process of the court to compel the attendance of his witnesses and if he introduces no evidence may have the concluding argument before the jury. At this time other advantages are allowed the accused; he may be a witness in his own behalf; if he does not testify the State Attorney is forbidden to comment upon the fact; under circumstances the county pays the mileage and per diem of his witnesses and the costs attendant upon his appeal, as was done in this case.

Proceeding with the discussion of the practice the Chief Justice said, that while the State Attorney cannot be compelled to call all the witnesses who were present at the

time of the commission of an offense, or all whose names appear on the indictment, the presiding judge, ''when prompted by sound discretion,'' may call and examine witnesses of his own accord when the interests of justice demand it, whether the witnesses be for or against the State. In such case the right of cross-examination of such witnesses is allowed to both State and defense. The rule, as it now prevails in this State, was referred to and approved in Brown v. State, 91 Fla. 682, 108 South. Rep. 842, in an opinion by Circuit Judge Campbell. But out of that rule no right of the prisoner has arisen which enables him to demand the calling of a witness for whom he is not willing to vouch as his own witnesss. The discretion to call or not call such a witness is vested in the presiding judge. It is as nearly a complete discretion, that is, one which is not reviewable, as exists in any trial court.

It is sufficient to say in this case, at least, that the defendant has not made it to appear that the refusal to call the witness as a court witness was an abuse of discretion to the injury of the defendant's rights.

Sheriff Lipscomb testified that after the defendant came to him at Hampton Springs, which was about the hour of twelve or twelve-thirty noon, the sheriff got a jury together and went to the defendant's house. When he arrived there he saw two pistols, one lying near the body of each dead man. The witness Blue said when he went to the defendant's house the morning of the shooting, which was some time before it occurred, he saw two or three pistols on the ''dresser'' in the room. Immediately after the shooting that witness went into the yard from the house and said he saw two pistols on the ground, one near each wounded, or dead, man, and they remained on the ground until the arrival of the coroner's jury. The witness J. D. McInnis also went to the defendant's house that morning,

arriving there about eleven o'clock, which was before the coroner's jury came. He saw the men lying in the yard dead, and three pistols on the "dresser" in the defendant's house. The defendant explained to the witness that one of the "pistols," a "black one," "belonged to the man in the yard." The defendant unbreached the pistol and showed that "*three*" cartridges had been fired from it. The other pistol, a "nickel-plated" one which was also on the dresser, the defendant unbreached and showed that "*two*" cartridges had been fired from that one and the defendant explained "that it belonged to the man that was under the house"; that the man had shot at the defendant "twice with the nickel-plated pistol," he said.

Now, afterwards when the coroner's jury arrived, the sheriff and the witness Fiveash, who was on the jury, saw these pistols in the yard lying near the bodies of the two men. The witness J. P. Thompson also arrived at the house about eleven o'clock and saw the pistols in the defendant's house. The defendant explained that they belonged to the two men in the yard. The sheriff was asked by the defendant's counsel if the pistols "appeared to have been moved."

The State's attorney objected to the question and the objection was sustained. That ruling constituted the basis of the forty-fourth assignment of error.

The question was inexpertly put if the purpose was to show that the defendant had not placed the pistols there after the shooting, thereby tending to refute the testimony of McInnis and Thompson. In that case the "pistols" could have borne no evidence of removal. Even if they had dropped from the hands of the deceased men they would likewise have borne no evidence in themselves of removal, unless there was some matter of finger prints. If, however, the pistols had fallen from the hands of the

men and were then removed by someone who subsequently replaced them, the ground and not the pistols would have borne the evidence of such fact. In the absence of the evidence of finger prints it would have been the only means of proof. However, the defendant's objection was removed by the next question which was answered without objection. The question was: "Did you see any signs on the ground where the ground looked like more than one pistol had lain near the bodies of the two dead men?" The answer was: "I don't think that I did. No, sir." So in the absence of any signs that the pistols had been moved when the sheriff arrived the inference could have with equal accuracy been drawn that they fell from the hands of the dead men or were placed there after the shooting by the defendant. We find no merit in that assignment.

The forty-fifth assignment is abandoned.

The forty-sixth and forty-seventh assignments of error are based upon the following ruling. The witness J. P. Jones, called in behalf of the State, said that about a week or so before the shooting the witness asked the defendant if he was not afraid to have whiskey in the car. The witness asked if the defendant was not afraid of the officers and the defendant replied that "he would walk over anybody that went to search his place." J. E. Jones, another witness, said that about a year before he went to the defendant's house to get a drink of whiskey and having taken a drink with the defendant asked the latter if he was not "afraid they will give you trouble about this." That the defendant replied: "No, I will kill them when they come after me." These answers the defendant's counsel moved to strike upon the grounds, among others, that: the words constituted no threat against the deceased men; that the testimony was too remote; that it had not been shown that the defendant kept whiskey in the house at the time of the

killing; nor, that either of the men were undertaking to search the house at that time.

The case consisted in many elements of circumstantial evidence, particularly in so far as the defendant's motives for killing the men were involved. The evidence tended to show his attitude toward all persons, including officers, who should come upon his place to search it for contraband liquors. The men who were killed had appeared at the defendant's house as officers of the law to search his premises for whiskey. They advised him of the fact. He knew their purpose. The evidence tended to show his mental attitude toward those men and in so far was contradictory of the theory that he killed in self defense. There was no error in that ruling. See Ward v. State, 75 Fla. 756, 79 South. Rep. 699.

No error appearing, the judgment is affirmed.

STRUM AND BROWN, J. J., concur.

WHITFIELD, P. J., AND TERRELL AND BUFORD, J. J., concur in the opinion and judgment.