McNULTY, Judge.
Appellant appeals from a first degree murder conviction in the death of her stepmother. We reverse.
Briefly stating the facts, it appears that the badly charred remains of appellant’s stepmother were found in the severely burned home theretofore occupied by appellant, her father, and the deceased. Several molten metal objects were found in the body and there was conflicting expert testimony as to whether two of such metal objects were .22 caliber bullets. Additionally, there was some testimony that all of the metal objects could have entered the body as a result of minor explosions or from falling objects incident to the intense heat of the fire. Experts also disagreed as to whether the origin of the fire can be said to have been arson. Moreover, neither of three pathologists could testify with certainty as to the cause of death, although they agreed that the victim was recently dead or dying at the time she would have otherwise died in the fire, but conceded that such antecedent death or imminence thereof could have been from natural causes. Other evidence placed appellant in the house within an hour of when the fire was reported, but there was much discrepancy, even among state’s witnesses, as to the exact time she was personally seen or her car was seen outside the house.
It was, and is, the state’s position that appellant killed her stepmother and that death ensued either from gunshot wounds inflicted by appellant or in the subsequent fire set by her. While the evidence aforesaid relating to bullets and arson tended to show criminal agency, the state sought to prove the essential element of premedita *260 tion, as well as identity of appellant as the killer, by two additional areas of evidence exclusive of appellant’s proximity to the scene and relative opportunity referred to above. First, it was established that appellant had signed for and purchased a .22 caliber pistol and ammunition at a gunshop on the morning of the fire. The shopkeeper testified that when she made such purchase she stated that she wished a gun “powerful enough to kill a man” but not make too much noise. He also said, however, that this was not an uncommon comment made by a purchaser of one of his guns and that he paid it but little mind.' Furthermore, it was shown that appellant had made prior purchases of guns from the same source and was somewhat of a gun fancier. Correlative to the purchase on this occasion, however, it was shown that two days following the fire appellant returned the purchased gun, and all but two of the bullets, complaining that the gun had malfunctioned. Standing alone, and it will be as we shall see, it is questionable whether the foregoing is sufficient to establish prima, facie that appellant had formed a premeditated design to effect the death of her stepmother or of any other identifiable person from whom such design could have been legally transferred.
The second area of evidence ostensibly going to premeditation and/or identity of the slayer concerned an alleged conference, occurring approximately one month before the tragedy, between appellant and an attorney who had previously represented her in other matters. This attorney, one James Wallace, testified over objection that appellant inquired about the cost of representing her in connection with possible homicide and about penalties therefor.[1] He said that appellant told him that she “was having difficulties with various people and she desired to eliminate those parties or persons that were in her way.” Such testimony was admitted on the theory that appellant’s statements constituted a threat and were therefore relevant to a premeditated design to kill. The only specifics given by the attorney as to whom such threats were directed against were that appellant said she was having difficulties with one Dexter Jones and his wife and she intended to do away with a member or members of the female sex. Nowhere in his testimony was there any mention of the victim in this case or of any class to which she might belong except, generally, “female.”
The point on appeal concerning the admissibility of this testimony of attorney Wallace is dispositive of this case and renders it unnecessary to discuss the other points on appeal.
Initially, we observe that the state introduced virtually no evidence of motive nor is a motive even suggested in arguments. Thus, when considered in the light of all the conflicting or circumstantial evidence relating to criminal agency, premeditation and identity of the alleged killer, the testimony of Wallace was prominent in the state’s case. The jury could have found corroboration of both identity and premeditation from this testimony or, at the very least, a propensity or predisposition on the part of appellant to kill generally. We are of the view, however, that this testimony is patently inadmissible for either purpose.
 Before such testimony is competent as evidence of a threat the law is clear that the quoted language must be directed at the victim or at a class to which the victim belongs, which class is sufficiently restrictive so that a reasonable inference may be made that the threat necessarily focused on the victim or on one against whom the assault was directed if other than the victim.[2] The state argues, on this point, that the evidence showed an intent to kill persons belonging to the class *261 of “females with whom she [appellant] was having difficulty.” Assuming that this may be a narrow enough classification under some circumstances from which a threat to the victim may be inferred, the record in this case is completely devoid of any evidence that the deceased was indeed a female with whom appellant was having difficulties. As indicated earlier, no motive was shown nor suggested and no animosity of any kind was shown to have existed between appellant and the deceased. Accordingly, Wallace’s testimony was incompetent on this score.
Concerning the relevance of Wallace’s testimony to show propensity or predisposition, of course, it is now rudimentary that any evidence related solely to propensity is inadmissible under the well-known Williams rule.[3] We can see no relevance of such testimony to any other issue in this case, so it is inadmissible on this count.
In view of the foregoing, therefore, it was error to admit the testimony of James Wallace and, because of the unquestionable prejudicial effect of such testimony, the judgment should be, and it is, reversed and a new trial awarded.
PIERCE, C. J., and MANN, J., concur.

. There is no question of the attorney-client privilege here since the communication between them allegedly concerned an offense to be committed in futuro.

. See cases cited in 40 C.J.S. Homicide §§ 206(c), 209; accord, Buchanan v. State (1928), 95 Fla. 301, 116 So. 275; Ward v. State (1918), 75 Fla. 756, 79 So. 699; Owens v. State (1913), 65 Fla. 483, 62 So. 651.

. Williams v. State (Fla.1959), 110 So.2d 654, 663.