SIMON, A SLAVE, PLAINTIFF IN ERROR, VS. THE STATE OF FLORIDA.

1. Whether the confession of a prisoner is or is not voluntary is a question for the determination of the Court; and it is error for the Court to refer it to the consideration of the Jury.

2. Although the inquiry should, in the first instance, have been restricted to the question of the influences which operated upon the prisoner to induce the confession, yet if it afterwards appeared that such confession was not voluntary, the Court should have arrested the examination, and withdrawn the evidence from the jury.

3. To render a confession voluntary and admissible in evidence, the mind of the prisoner should at the time be free to act, uninfluenced by fear or hope. Where the prisoner had been arrested on a charge of arson, on suspicion merely, and carried to the Magistrate's office, a large and excited crowd of persons attending, from the violence of which the firmness and determination of the Magistrate was barely sufficient to protect him, and thus situated, the excited populace remaining without the office, but within the hearing of the prisoner, who exhibited marks of great terror and alarm, he, the prisoner was urged by the Magistrate to confess his guilt, saying to him that "they were satisfied of his guilt—that he would be put upon his trial and would certainly be hung—that if he had accomplices, they would be put upon their trial, and not him, if he would turn State's evidence;" and thereupon the prisoner confessed his own guilt, but denied he had any accomplices: HELD, That the circumstances of the case lead to and induce the conclusion that the confession was not voluntary, but was forced from the mind of the prisoner by the "torture of fear."

In this case, the prisoner's guilt, according to the bill of exceptions, rested alone on the confession, unsupported by any proof of the circumstances which directed suspicion against him; and in the proof of the *corpus delicti*, the statement of the prisoner as to the place where the house was fired, was contradicted by two witnesses.

At the June term, 1853, of the Circuit Court for Escambia County, the Grand Jury presented an indictment against Simon, the plaintiff in error, for burning a dwelling house belonging to Richard T. Maxwell.

The record, after stating that certain persons, naming them, were on the tenth day of June chosen and sworn as Grand Jurors, proceeds to state that " on another day, the fifteenth day of June, in the year one thousand eight hundred and fifty-three, the Grand Jurors came into Court and presented the following bill of indictment, which said indictment is in the following words and figures, and is endorsed as follows :"

The indictment is in the usual form, and is endorsed thus : "State vs. Simon, a slave"—" Arson." " A true bill. Wm. H. Baker, Foreman."

The following bill of exceptions, embracing the testimony offered on the trial, and the rulings of the Court, was made a part of the record :

BE IT REMEMBERED, that on the trial of this cause the State produced the following witnesses, who testified as follows :

1st. Joseph Sierra was produced as a witness for the State, who being sworn, testified, that Doctor Maxwell's house was burned down in Pensacola on the seventeenth day of October last—that the house formerly belonged to Mr. Ahrens, but had been sold by him to Dr. Maxwell— that it was in the morning of the 17th October, that the house was set on fire and burned down. Simon, the prisoner at the bar, was afterwards taken up, and brought before the witness on suspicion, the witness being at that time, Mayor of the City of Pensacola—that Simon made confession before the witness that he had set fire to Maxwell's house—that no compulsion and no influence was used to extract from the prisoner such confession. That witness said to Simon that if he told the truth, and that if he, the prisoner, was the one who burned the house, he would be put upon his trial and would be certainly hung ; that if he had any accomplices he would, by testifying

Simon, a slave, vs. the State of Florida—Statement of Case.

against them, become State's evidence, and they would be put upon their trial and not him. Witness said to Simon, the prisoner, do not bring any innocent person into this matter, for if you do, although you may not be punished in this world, you will be in the next, which is worse. If you bring any one into this matter, let it be one who is guilty. Simon hung down his head for a while, and I asked him what he had to say? He replied, send for my master, and I will tell the whole. Witness then sent for his master, Mr. McVoy, and when he came witness told him what had happened. The prisoner then asked his master, Mr. Mc-Voy, as he had already asked the witness, as to the consequences of his confession, or in relation to the punishment if he should tell the truth, and Mr. McVoy made the same reply to him which the witness had made.

Simon, the prisoner, then said, he had set fire to Dr. Maxwell's house, that he was by himself at the time he did it, and that no body else was with him. This confession was about the 21st or 22d of last October, and the house was burned in this county. On the next morning the prisoner was committed.

Witness visited the prisoner in jail to find out if he had any accomplices, and on one occasion he told the witness that there was a boy who was an accomplice, but that he did not know his name. Witness procured the boy to be apprehended, but the prisoner declared that he was not the one, and so the boy was discharged.

Upon his cross examination, the witness said that there was great excitement among the people—that there was a great crowd, but that the excitement was out of doors, and that the people said, he the prisoner, should be hung. Witness told the prisoner that they were satisfied about his guilt, and that all they wanted to know was who his accomplices were. At the time prisoner made his confession

witness asked whether he had set fire to Moreno's, Collin's or Maxwell's house? Witness says there were no threats and no coercion used toward the prisoner, and no promise made him to induce the confession. Witness says he thinks that but for his protection afforded the prisoner, the people would have taken him into their own hands. Witness says he had several interviews with the prisoner in jail, and at the second interview the prisoner told witness that he had an accomplice. Witness said to the prisoner, you are in irons and you cannot escape. Witness told him he had to come to trial, and that it he had any accomplices, he had better inform upon them before they got away from town. Witness told him he had better inform upon his accomplices for the benefit of the community, so that they might be arrested. Witness told the prisoner that he would be State's evidence if he had accomplices and would disclose them. The prisoner appeared to be greatly alarmed, but the witness told him he should be protected.

In reply to the questions here asked by the State, witness said, I used no threats and held out no promises or favors to the prisoner at the time he made his confession of guilt. The house burned was a dwelling house, and at that time was undergoing repair by Doctor Maxwell, who was then living in another house. Don't know whether any one was sleeping in the house that was burned, at that time or not. Prisoner said he had set fire to the east window under the gallery, and staid there until it was blazing. Witness says the house fronted south, and that the window which the prisoner said he fired, was the last window fronting on the gallery to the east. Witness says that the excitement to which he has testified, was sometimes in the presence of the prisoner, and sometimes not, but in his hearing.

2d. John Brosneham was then produced as a witness for the State, who being duly sworn, proved the articles of agreement between Henry Ahrens and Doctor R. T. Maxwell, conveying the house that was burnt, to Doctor Maxwell.

3d. Richard T. Maxwell was now introduced by the State, and upon the agreement and conveyance of the house and lot between Ahrens and himself being placed in his hands, he acknowledged that he executed it, and said that the house that was burned down, and for which the prisoner was then on trial, was the property designated in said agreement.

Upon his cross examination, Doctor Maxwell said that he was not residing in the house at the time it was burned, but that he was then living in another house—that the house that was burned had not been occupied for two or three months previous to the burning, but that about six weeks before the burning, a negro woman slept in the kitchen by his permission—says that the house he was residing in at that time is in Pensacola.

In answer to a question here presented by the solicitor for the State, Doctor Maxwell said that the house that was burned was a dwelling house.

4th. Henry Ahrens was now introduced as a witness by the State, and being first sworn says, upon the said agreement between him and Doctor Maxwell being shown him, that it was executed and delivered by him to Doctor Maxwell—says that previous to the execution of said agreement he was in possession of the house—that he built it, and that he lived in it sometime before he sold it to Doctor Maxwell, but did not live in it at that time, but was then living at Arcadia in Santa Rosa county.

Here the Solicitor for the State announced that he would rest the case for the State for the present, and thereupon,

37

on the part of the prisoner, the following witnesses were produced, who testified as follows :

Joseph Comnyns, who being first sworn, testified that he saw the house on fire about two o'clock in the morning —that he thinks the fire commenced in the upper story— that he was about the first to give the alarm, that he heard somebody there, and knew it was Mr. Knapp and Joseph Sierra by their voices—that the house had no basement of brick—that it had an attic, and that he thinks the shingles were set on fire—that the fire was running out on the shingles when he first saw it—that he was at the custom-house, about two hundred yards off, when he first discovered the fire, and that he saw the fire over the top of McVoy's and Moreno's and Brosnaham's houses—that he went to the market-house before he went to the fire—that he could not see the. ground floor of the burning house from the position in which he stood at the custom-house—that the windows of the house that was burned came pretty near to the roof of the house—that he thinks he could have seen the window in the south east corner of the house, if it had been on fire, from where he stood, but did not take much notice—that the street where he stood runs up by the house that was burning—that he noticed nothing but the fire, but that he could have seen the fire in the front windows from where he stood, had they been on fire, but don't know whether the lower part of the house was burning when he got there.

The defendant then introduced Chester P. Knapp, who testified, that he saw the house on fire between two and three o'clock—that the south east attic was burning when he first saw it—that he saw the fire through the windows, that he went in at the front gallery and saw no fire there and saw none of the windows burning—that he tried to break down the door—thinks he would have seen the fire

Simon, a slave, vs. the State of Florida—Bill of exceptions.

in the front windows if they had been burning—that the building was a story and a half high—that it was through the upper windows that he first saw the fire—that the windows above were the smallest, that the windows below had blinds, but does not remember as to the upper windows.

Hereupon the defendant rested his case, and the State offered to produce Mr. McVoy as a witness, to prove the ownership of the slave Simon, the prisoner. To this the defendant, by his counsel, objected, and the Court overruling the objection, Mr. McVoy was sworn, and testified that the prisoner is his slave, his property.

And upon his cross examination by defendant's counsel, Mr. McVoy said that he had heard Mr. Sierra's testimony, and that he was in the Mayor's office when the prisoner confessed—that the prisoner was under a great state of excitement, that he was laboring under great terror, and that he never saw any one more terrified—that witness, Mr. Sierra, and the city marshal were in the room with the prisoner, and the crowd on the outside.

Thereupon the counsel for the prisoner moved the Court to withdraw the confessions of the prisoner from the jury, because it satisfactorily appeared that the said confessions were elicited from the prisoner by undue terror or the hope of reward, which motion was overruled by the Court, the Court not being satisfied that the said confessions were obtained by undue terror or the hope of reward, and thereupon the said confessions were referred to the jury, leaving it to them to say whether they had been elicited from the prisoner by undue terror or the hope of reward.

Whereupon the counsel for the prisoner made their exception to the ruling of the Court, and prayed that this bill of exceptions might be signed, sealed, and made a part of the record in this case. Which is accordingly done.

*Campbell* for the plaintiff in error.

First. The first error assigned is, that there is nothing in the record to show that the Grand Jury found a true bill against the prisoner. Holton vs. the State, 2 Fla. R., 476.

Second. It was left to the jury to say whether the confessions of the prisoner were admissible ; whereas it was the province of the Court, and not of the jury, to decide upon their admissibility. 1 Phil. Ev., 18 ; 2 Starkie Ev., 36 ; 2 Russell on Crime, 826 ; Roscoe Ev., 34 ; 1 Greenl. Ev., 255.

Third. The Court should have ruled out the confessions, because it was evident they were extracted by fear and the hope of favor.

A confession to be admissible, must be free and voluntary, it must not be extracted by any sort of threats or violence, nor be obtained by any direct or implied promises however slight, nor by the exertion of any improper influence. 2 Russell on Crimes, 825, 826 ; 1 Chitty Cr. Law, 570, ; 1 Wheeler, 69. And to ascertain whether a confession is voluntary, we are not simply to consider the language used to the prisoner by the person to whom it was made, but also the age, situation and character of the prisoner, and the circumstances under which he was at the time the confession was elicited. 1 Greenleaf, 255.

We contend that under these rules, the confessions of the prisoner were clearly inadmissible. It is clear that the first confession was induced by fear and the hope of favor. By fear. The prisoner was a slave, and therefore more readily operated upon by the appliance of fear.

At the time his confession was made he was laboring under the greatest terror induced by the presence of an excited crowd, who threatened his life, and who were only restrained from executing their threats by the authority of

the mayor; and the prisoner was urged to confess by the mayor, who assured him his guilt was known, and that if he was the only person concerned in the crime he would certainly be hung. 2 Russell on Crimes, 831; Serpentine vs. the State, 1 How., 256.

By favor. The promise of protection made by the mayor was, under the circumstances, a powerful inducement to the prisoner to confess; and he might very naturally have thought it necessary to ingratiate himself with the only protector he had in the multitude around him. Mill's Case, Russell on Crimes, 828–831. When life is in peril, fear prompts us to take any step that may insure immediate safety, even though it may result in an equal though more remote danger.

Again, the promise of the mayor, that if the prisoner "had accomplices, by betraying them he would be admitted as State's evidence, and they would be put on their trial, and not him," was clearly sufficient to exclude the confession. 2 Russell, 828–829. The fact that he discovered no accomplice, and that he was admonished that if he was the only guilty party he would be hung, does not remove the objection. The law cannot measure the force of the influence used, or decide upon the effects it may have upon the mind of the prisoner. 2 Russell, 826.

The second confession was also induced by promise. The prisoner was told it would be better for him to betray his accomplices, so that he might become State's evidence. Authorities above cited.

The mayor, to whom the confessions were made, says he made no threats or promises to elicit the confessions from the prisoner, and such doubtless was his intention. But the question is not whether he intended to excite hope or inspire fear, but whether the language employed might be

so construed by the prisoner as to produce those results. 2 Russell, 831.

*Archer*, for the Attorney General, for the State.

SEMMES, J.:

The first error assigned, is, that there is nothing in the record to show that the Grand Jury found a true bill of indictment against the plaintiff in error, and the case of Holton vs. the State, 2 Fla. R., 476, is relied upon as authority. We have carefully revised the decision in that case. It is certainly distinguishable from the one before us, and we certainly are not disposed to extend any further the principles of that decision. Immediately after the caption of the record, in this case, which contains all the essential requisites, follows this statement : "And on another day, to wit, the fifteenth day of June, in the year of our Lord one thousand eight hundred and fifty-three, the Grand Jurors came into Court and presented the following bill of indictment, which said indictment is in the following words and figures, and is endorsed as follows, to wit :" Then follows a copy of the indictment, with the finding of the Grand Jury, closing with the usual certificate of the clerk. The record is a complete and perfect one, and a mere statement of the facts is a sufficient answer to the objection.

The second assignment of error is, that the Court below left it to the jury to determine whether the confession of the accused was voluntary or not? It was undoubtedly the province of the Court to determine in the first instance as to the admissibility of these confessions. There is a manifest distinction between the questions, whether a confession be voluntary or not, and the credit and weight to be given the evidence establishing the confessions. The one is as exclusively a question for the Court, as the other

is for the jury, for it is only when the confession is voluntary that it becomes legal evidence, and can be submitted to the consideration of the jury.

It oftentimes may become a question of no little embarrassment to determine whether the confession is voluntary or not, but still, the law has reposed the exercise of this power in the Court, and it cannot be delegated to the jury. Their province is widely different; they are not concluded by the confessions, when submitted to them, for they are to determine not only the weight and credit to be given the testimony of the witnesses, who depose as to the confessions, but the credit to be given to the confessions themselves.

We do not consider this to be an open question. There is no conflict of authorities on the subject, and the doctrine is universally acquiesced in by the English and American Courts. A note by the Editor of Russell on Crimes, is relied on as maintaining a different doctrine. 2 Russell 5 Amer. Edit., 826, n. 2. But it is very evident that the questions, as to the admissibility of the evidence, and the credibility of the witnesses, have been confounded. Otherwise, the note of the Editor is not only at variance with the text. but with the authority referred to. In case of Rex vs. Nute, 2 Russell, 832, it is true the confessions were in evidence, and the jury were allowed to pass upon the question whether they were voluntary or not, but on a case reserved, the Judges held that these points were not for the jury.

It is insisted by the Attorney General, that the evidence in relation to the confessions being voluntary, having gone to the jury, it was too late afterwards to object to its admissibility. It is true, the investigation in the first instance, should have been restricted to the motive and influence which may have operated on the mind of the pris-

oner, in making these confessions; it was a preliminary question, and the judgment of the Court should have been invoked on that. But it is none the less true, that it was in the power of the Court to have arrested the examination and withdrawn the evidence at any time during the progress of the trial.

The third assignment of error, is, that the Court should have ruled out the confessions, because they were not voluntary.

To render a confession voluntary and admissible as evidence, the mind of the accused should at the time be free to act, uninfluenced by fear or hope. To exclude it as testimony, it is not necessary that any *direct* promises or threats be made to the accused. It is sufficient, if the attending circumstances, or declarations of those present, be calculated to delude the prisoner as to his true position, and exert an improper and undue influence over his mind.

The evidence in this case was, that the accused was arrested on suspicion. What the grounds of suspicion were do not appear. He was taken before the mayor of Pensacola, at his office. A large and excited crowd was present, declaring that the accused should be hung, and but for the firmness and determination of the mayor, would have seized upon him. He was informed by the mayor that the crowd was satisfied as to his guilt, that he would be put upon his trial, and would certainly be hung. That if he had accomplices they would be put upon their trial, and not him—that he would become State's evidence. The mayor further testifies "that the accused was greatly alarmed." The city marshal, who was also present, testifies, that the accused was under great excitement, was laboring under great terror, and that he never saw any one more terrified. Under these circumstances, he was urged to confess. When asked, what he had to say? he replied,

Simon, a slave, vs. the State of Florida—Opinion of Court.

" send for my master and I will tell the whole." Upon his master appearing, the previous statements of the mayor were repeated to the accused, and he confessed his guilt. The next morning he was committed to jail, and upon a second interview with the mayor he again confessed his guilt and accused some one as his accomplice, who on being arrested he failed to identify.

There were no corroborating circumstances in proof, in aid of the confession, though there was evidence to disprove a part of his statement. Upon this state of the facts he was convicted and sentenced to be hung.

There are few cases to be found in the books where stronger influences were brought to bear on the mind of the prisoner to extract a confession than the one before us. That it was made under the influence of fear or apprehension of personal violence, can scarce be doubted. The fact of the assurance of protection, on the part of the mayor, from the threats and violence of the crowd, was but additional inducement to the confession; for, connecting the language of the mayor with the terror inspired by the crowd, it is but fair to presume that the conviction was, that his confession was the only immediate security for his person and his life. The fear of immediate punishment may be as powerful an agent in extorting a confession, as the punishment itself. If, from the situation and character of the accused, the circumstances were calculated to, or did inspire him with, this fear, his confessions came at least within the spirit of the rule excluding them as evidence. The impression and conviction was made—the agency is of no consequence.

The second confession made in prison, it is reasonable to infer, was induced by the circumstances attending the first. The presumption is, that the previous influences continue, and such presumption must be overcome. The

37

State vs. Guild, 5 Halst., 163. Explicit warning of the accused by the magistrate, and length of time intervening, are circumstances which may render the subsequent confessions evidence. *Ibid.* These do not exist in this case.

It is true, the precise time when the subsequent confession was made, is not stated, though it is clearly inferable it was the next day. Whether this be so or not, it was incumbent upon the prosecution to have proved the time, and failing to do so, the accused is entitled to all the benefit of the omission. Independent of these confessions, the fact that the accused is a slave, and the confession to, and at the instance of his master, are circumstances entitled to the most grave consideration; the ease with which this class of our population can be intimidated, and the almost absolute control which the owner does involuntary exercise over the will of the slave, should induce the Courts at all times to receive their confessions with the utmost caution and distrust. And the facts of this case afford a strong commentary upon the uncertainty and danger of these confessions. In the course of his examination the accused undertook to state the particular part of the house which was set on fire. He says he set fire to the east window of the first story under the gallery, and that he staid there until it blazed up. One of the witnesses is satisfied the fire commenced in the upper story; the shingles he thinks must have been set fire to from the attic—the fire was running out on the shingles. He believes he could have seen the east window had it been on fire, from where he stood.

Another witness says, he discovered the south-east attic on fire, that he went into the gallery, but he saw no fire there; none of the windows were burning. These witnesses, who are unimpeached, and whose testimony is uncontradicted, establish the fact, that the confessions of the prisoner as to the particulars of the burning, were alto-

gether untrue. It is true that the jury were competent to believe his confession as to his guilt and reject the balance of his statement. But the record does not disclose a solitary circumstance from which we would be warranted in believing one statement more than the other.

If the confessions were voluntary, it would be difficult to conceive of a motive for giving this detailed statement of a matter so clearly proved to have been false. We can only reconcile the confessions with the fact that when made, the prisoner was laboring under excitement and apprehension.

Judgment below reversed, cause remanded, and new trial ordered.

WRIGHT, C. J., delivered the following dissenting opinion:

The record in this case presents the following facts:

On the 17th October last the dwelling-house of R. T. Maxwell was burned in Pensacola. On the 21st or 22d of the same month, Simon, the prisoner, was apprehended and taken before the mayor of Pensacola, Mr. Sierra, on suspicion of setting fire to the house. He made confession of his guilt. The witness, Sierra, testifies that no compulsion and no influence was used to extract from the prisoner such confession—that "witness said to Simon that if "he told the truth, and if he was the one who burned the "house, he would be put on his trial and would certainly "be hanged." On cross examination, the witness says, "there was great excitement among the people—there was "a great crowd, but that the excitement was out of doors, "and that the people said, he, the prisoner, should be "hanged." And further, that witness "thinks that but for "his protection afforded the prisoner the people would "have taken him into their own hands."

There is much other testimony presented by the bill of exceptions, such as that after Simon had confessed his guilt, the witness urged him to disclose the names of his accomplices, if he had any. Whereupon Simon hung down his head, and requested that his master might be sent for—that on the coming of his master, Simon repeated his confession, being warned by his master, as he had been previously warned by the mayor, viz: that if guilty he would be tried and hanged, and Simon added, that in setting fire to the house " he was by himself, and that nobody was with him."

The next day while in jail, Simon named an accomplice in his crime, who on being apprehended proved not to be the man, &c.

In the Court below, the prisoner's counsel moved the Court to exclude this testimony from the jury on the ground that the confessions of the prisoner were obtained by undue terror.

Three distinct grounds of error are assigned here. In relation to the first, the Court is agreed. The second and third I shall consider together.

The general rule in cases like the present, is, that if there be reasonable ground for presuming that the confession was made under the influence of any promise or threat of a temporal nature, the evidence ought not to be received. 2 Hale, 285 ; Arch. Crim. Pl., 109. Here it is urged that such a threat was conveyed in the declaration made by Sierra to Simon, " that if he told the truth, and if he was " the one who burned the house, he would be put upon his trial, &c. I think otherwise, and that Sierra's declaration to Simon is to be regarded rather as a warning—an admonition, than as a menace, calculated to overcome the mind of the prisoner, and render his confession unworthy of credit. The kind of threats which the law regards as

fatal to confessions of this character, are threats of present or prospective evil, made in order, or with the effect, to *induce* confession. Such would be a threat of prosecution or any other personal harm. In this case, however, the object of the witness, Sierra, was (and such was the obvious effect of his warning,) to put Simon on his guard against disclosing any thing but the truth. It is not to be denied that a confession obtained by any undue means should be excluded from the jury. 2 Russ. on Crimes, 645 ; 2 East. P. C., 658 ; 1 Phil. Ev., 104.

But in this case no undue means were used. I cannot regard the crowd outside, and their excited declarations, as constituting such undue means. The natural and probable effect of these excited declarations was, not to induce the prisoner to make a false confession of his guilt, but rather to induce him to persist in a denial, though he might be ever so guilty.

The question in all cases like the present, is, "whether the inducement held out to the prisoner was calculated to make his confession an *untrue one*." Arch. Crim. Pl., 111. In this case there was no such inducement.

I think the Court below was right in permitting the confession to go to the jury.