## ERNEST DAUGHERTY v. STATE OF FLORIDA

17 So. (2nd) 290                                    January Term, 1944
March 24, 1944                                              En Banc
Rehearing Denied April 13, 1944

*Knight & Knight* and *Zach H. Douglas,* for appellant.

*J. Tom Watson,* Attorney General, *John C. Wynn,* Assistant Attorney General, and *Bourke Floyd,* Special Assistant Attorney General, for appellee.

TERRELL, J.:

Appellant was indicted in Bradford County and tried for murder in the first degree, he was convicted of murder in the second degree and sentenced to thirty years in the state penitentiary at hard labor. He contends on appeal that he should be relieved of that judgment.

The appellant was a young man twenty-one years of age and in company with his brother went to the store of the deceased, Dan Moore, late at night, November 21, 1942, for the alleged purpose of purchasing some groceries. He (appellant) had been drinking and as soon as he entered the store a controversy arose between him and Moore which resulted in his shooting Moore, killing him instantly. Appel-

lant and his brother fled the scene and went to Jacksonville, about 40 miles away where they spent the night. The next day they went to Lakeland, Florida, about 135 miles from the scene of the killing, where they were arrested a few days later.

They were forthwith returned to Bradford County by the sheriff and appellant was delivered to the state prison at Raiford a few miles distant, to be held in custody pending his trial. While in the hands of the officers at Lakeland on his return to Bradford County and after he was incarcerated at Raiford, appellant made confessions which were admitted in evidence at the trial. It is contended that these confessions were illegally admitted in evidence because they were not freely and voluntarily made.

There is a conflict of opinion among the members of the Court upon this point, some of the justices being of the view that the evidence referred to amounts in law to nothing more than an admission against interest falling far short of an acknowledgment of the crime charged; while others are of the opinion that the evidence amounted in law to a confession of the crime obtained under such circumstances as will necessitate a reversal of the judgment and the award of a new trial. The majority view of the Court is that it is immaterial to the ultimate outcome of the appeal whether the evidence adduced under the circumstances complained of amounted to a confession illegally secured or to a mere admission against interest, likewise illegally secured, as there is ample evidence otherwise to sustain the conviction, and it cannot be said that the evidence urged to have been illegally secured affected the verdict.

Appellant also contends that he was intimidated by the arresting officers, that the state attorney was abrupt to him and cursed him for a damn liar and that he was young and ignorant and inexperienced having hardly reached the fifth grade in the public schools.

Youth and illiteracy are no defense for committing murder. The circumstances leading up to its culmination show that it was deliberate and that it was in the mind of the appellant when he went to the scene of the homicide. An

illiterate man twenty-one years of age is equally as competent to plan and commit murder as one highly educated. In fact literacy adds nothing to criminal capacity; it tends to detract from one's knowledge of the commonplace and the motivating processes of those who think in terms of crime commission. Literacy adds largely to the cultural aspect and increases one's skill with a learned profession but it is profitless to the man who puts a pistol in his pocket and whiskey under his shirt and goes out to make demonstration of his courage. Academic learning might have infused him with a different brand of courage but the law does not excuse murder for the lack of it.

We find no evidence supporting the charge of derogatory remarks by the State Attorney except that of appellant and there is a dearth of reason for reversal on that ground. There is no reason under any circumstances at any time for a prosecuting officer to be rude to a person on trial. It is a mark of incompetence to do so but in view of what we have repeatedly said on this point, it would hardly seem profitable to say more except to suggest that if the pinch comes that his legal and courtesy vocabulary have run dry and he must resort to baser sources to express himself he might with profit spend a season at the feet of Judge WHIT-FIELD or some other great preceptor and learn the art of forbearance and being gracious. Indeed he might spend a little time enlarging on his legal lore; that is the best avenue to a tendency to deal squarely with the one on trial and bless rather than damn him.

It is next contended that the trial court committed reversible error in calling the witness, Clinton Daugherty, to testify as the "court's witness."

It is revealed that Clinton Daugherty had been the state's winess before the grand jury and before the proceeding in habeas corpus prior to the trial and that his testimony in both instances supported the state's contention but that he had subsequently made inconsistent statements which the state desired to introduce other evidence to impeach.

For this reason the state attorney considered the witness a hostile one and requested the court to call him as the

"court's witness." We find no objection in the record to this procedure but if we did in view of the wide latitude granted the trial judge in such matters and in view of what took place in this case we find no reversible error on that point.

Other questions argued have been considered but we find no reversible error, so the judgment is affirmed.

Affirmed.

BUFORD, C. J., BROWN, THOMAS, ADAMS and SEBRING, JJ., concur.

CHAPMAN, J., dissents.

CHAPMAN, J., dissenting:

The grand jury of Bradford County, Florida, at the Spring Term, A. D. 1943, indicted Ernest Daugherty for the crime of murder in the first degree in the unlawful killing of Dan Moore on November 21, 1942. On June 7, 1943, Ernest Daugherty was arraigned and entered a plea of not guilty to the indictment; placed upon trial, and convicted of murder in the second degree and by the trial court sentenced to the State prison at hard labor for a period of thirty years, and has perfected therefrom an appeal here.

Seven questions are posed, argued, briefed and submitted to this Court for adjudication by counsel for the respective parties. It is our conclusion, in the light of a study of the record, briefs and cited authorities, coupled with an independent search of applicable cases, that the questions, or some of them, can or may be, for the purpose of this opinion, consolidated, and in so doing due consideration be given to the several contentions of counsel for the respective parties.

One of the instructions to the jury by the trial court during the progress of the trial is viz: "In this case there is what is contended by the State to be one or more confessions of the accused in relation to his connection with the murder of Dan Moore. Confessions, when made without any effort to obtain them, either from fear or promises of reward in any manner, or when freely made, without inducement or threat, are strong evidence against a party when unexplained or not denied." This charge or instruction is the basis of appellant's question one viz: "In a murder case, when the killing

is admitted and the defense is self-defense should the Court, in its charge to the jury, call the killing a 'murder' "?

The contention is made that the employment of the words "murder of Dan Moore" by the trial court in the instruction, *supra*, was to the appellant prejudicial and in effect carried the implication to the jury that the appellant murdered Dan Moore and therefore was a merciless or cold-blooded murderer. Many cases are cited and considerable space in appellant's brief devoted to this contention. Our study of the challenged charge or instruction impels the conclusion that the employment of the words "murder of Dan Moore" by the trial court in no manner expressed the court's view or conclusion on the testimony; nor did a reasonable inference follow that the appellant murdered Dan Moore. The term employed in the challenged instruction was for the sole purpose of making clear the contention of counsel for the State to the effect that they (counsel for the State) "contended" that the appellant was the murderer of Dan Moore. We fail to find merit in this contention.

The record reflects that Clinton Daugherty, with his brother Ernest Daugherty, rode in a car to a grocery store owned by the late Mr. Moore, situated in the neighborhood, for the purpose of obtaining groceries. On reaching the store of the deceased they found it closed; located Mr. Moore, and he opened the grocery store at their request. The witness, Clinton Daugherty, while in the store of the deceased and in the presence of his brother, Ernest Daugherty, bought a few articles of merchandise. He heard a conversation between the deceased and his brother, pertinent portions of which are viz:

"A. The beer was ordered, and we intended to take some beer home with us. I walked over to the bread rack; and, at the time, he kept the meat in the back of the store in a box, and I walked on back there; and, I guess—I couldn't say now how long I was back there, if there any, but I walked to the bread rack. Ernest stopped at the end of the counter. The drink counter. At that time I didn't know they had moved the meat up further towards the front counter, but they had. I had my beer in my hand and I was over next to the bread

counter, and I drank I don't know how much of mine, but some out of it— Q. Go ahead and tell us what happened. A. Well, when I first walked in—I missed that. When I first walked in—Why, that was after I had ordered some steak— Ernest said, 'Well, Mr. Moore, I guess I am going to the Army' or 'I'm Army bound,' or something like that— Q. Ernest said that to Mr. Moore? A. Yes; and he said, 'Well, maybe it's a damn good thing and you'll let my gal alone.' Q. Mr. Moore said that? A. Yes. I wasn't paying much attention to it, but I heard Ernest say, 'I haven't gone with your gal,' and he said 'And furthermore you may not find your wife when you get back.' Q. Mr. Moore told Ernest that? A. Yes. And I went on drinking my beer. So, suddenly, after I walked close to the counter— Q. Where was Mr. Moore during this conversation? A. He was over back of the counter. Q. Back of the cold drink counter? A. Yes, sir. Q. Where was Ernest? A. On this side, right at the end of it. Q. On the opposite side of the counter from Mr. Moore? A. That's right. Q. Facing him? A. That's right. Q. A counter between them? A. That's right. Q. All right. A. I don't know how come me to look around. I had a bunch of cokes and things there, and I reckon I was fixing to carry some back with me; but I looked around and it looked like to me that Mr. Moore stepped back and turned, and I had my bread in my hand, and I heard the gun when it fired and I didn't know which one fired the gun until I seen Moore when he fell over, and then I run. Q. So that is what happened there that night? A. Yes, sir. Q. What did Ernest do after the gun was fired? A. Well, he got in the car and overtaken me and picked me up and carried me to the house. Q. You ran out first? A. Yes, Q. And you ran about how far down the highway? A. It must have been about a hundred and fifty yards. Q. And Ernest ran and jumped in the car and overtook you and picked you up? A. Yes sir; he took me in the car—picked me up."

The name of Clinton Daugherty appears on the indictment along with other State witnesses. The State Attorney, during the trial, represented to the court that Clinton Daugherty, was a hostile witness and was present when Dan Moore

was killed. It was his view that the jury should have the benefit of his testimony, but it was manifestly unfair to the State, because of the witness' alleged hostility, and being brother of the appellant, for the State to vouch for him and be bound by his testimony; that Clinton Daugherty should be called as a court witness. Counsel for defendant pointed out that Clinton Daugherty had appeared and testified as a State witness in a habeas corpus proceeding and before the grand jury and had at all time been accessible to counsel for the State and not to defendant's counsel, and for these and other reasons the witness should not be called as a Court's witness. Clinton Daugherty, brother of the appellant, and only eye witness to the difficulty between Ernest Daugherty and Dan Moore on the night of November 21, 1942, was called to the stand, sworn, and testified as a court's witness. The record discloses a broad range of interrogation of the court's witness by counsel for the parties. We observe disputes and conflicts on pivotal points in the testimony of the witness.

The trial court permitted the State Attorney, over the objections of counsel for appellant seasonably made, to introduce testimony or statements made by Clinton Daugherty under oath when a prisoner in the county jail at Starke to the State Attorney and before the court reporter; and they are, in part, viz:

"Q. Then what happened? A. I told Mr. Moore, 'I want to get a little steak and a loaf of bread' and Ernest walked in then and I thought maybe he wanted a beer and I said 'give us a couple of beers' and I turned and walked over to get my bread, and the gun fired and I lit out. Q. Now, was Mr. Moore doing anything to Ernest to cause Ernest to shoot him? A. I did not see him do a thing in the world. Q. Was Ernest and Mr. Moore quarreling? A. No, sir. Q. Had Mr. Moore said anything to Ernest? A. No, sir. Q. Had Ernest said anything to Mr. Moore? A. No. Q. So then when Ernest shot Dan Moore, there had been no argument between them? A. Not that I saw; no, sir. Not that I heard. I didn't hear a word between them. Q. Moore was not doing a thing to Ernest? A. No, sir, not a thing. Q. After you ran out the door and Ernest picked you up, did Ernest have

anything to say to you? A. The only thing he said was, 'What the hell you doing? You getting chicken hearted?' and I said, 'Man, look what you done,' and then he never said no more about it. Q. Had Ernest said anything to you to indicate that he intended to kill Dan Moore? A. No, sir; only he said if the son of a bitch made the first move he would kill him.' "

On motion of counsel for defendant below the trial court instructed the jury with reference to the testimony of Clinton Daugherty viz:

"The Court: The motion is granted. The testimony of Clinton Daugherty, as read in question and answer form from the stenographic notes of the reporter are to be considered by you as impeachment matter only. That is to say, that if you find some conflicts in the testimony given by Clinton Daugherty on the witness stand, then you may consider it as bearing upon the credibility of the witness Clinton Daugherty, and for that purpose only should you consider the testimony just read from the notes of the reporter. Mr. H. V. Knight: We move the Court to instruct the jury that it is not proof of any matter or fact stated in that testimony. The Court: And in addition, Gentlemen, the testimony as read from the stenographic notes of the reporter is not proof of any of the facts stated. It goes to you for the purpose just explained to you by the Court—the purpose of impeachment."

The adverse rulings of the trial court in calling to the stand Clinton Daugherty over the objection of counsel for appellant, and permitting the court reporter to testify, for impeachment purposes, from his notes as to a contradictory statement by the witness, forms the basis of appellant's questions 5, 6 and 7.

The trial court in the exercise of its discretion, called Clinton Daugherty, an eye witness to the difficulty and brother of the appellant, to the witness stand as a court witness. Broad latitude was granted counsel for the parties in the examination of the witness. The court below entertained the view that the testimony of the witness would prove helpful and beneficial to the jury in reaching a verdict. Evidence

was adduced by the State calculated to impeach the court witness. Counsel for the appellant contends that the calling of the witness to the stand as a court witness was (1) an abuse of discretion; and (2) the testimony adduced calculated to impeach the court witness constitutes reversible error. The answer to questions 5, 6 and 7, *supra,* is our holding in the case of Brown v. State, 91 Fla. 682, 108 So. 842. See Selph v. State, 22 Fla. 537; Buchanan v. State, 95 Fla. 301, 116 So. 275; Morris v. State, 100 Fla. 850, 130 So. 582.

Appellant's questions 2, 3 and 4 challenge the voluntariness of a confession on the part of the appellant (defendant below) adduced into evidence by the State during the progress of the trial, over seasonable and appropriate objections by counsel for the appellant. The record reflects conditions and circumstances surrounding the defendant prior to the time of making the confessions viz: (1) appellant was approximately 21 years of age; (2) his education was equivalent to that of the third or fourth grade; (3) he had never attended a court proceeding or been called as a witness before any court; (4) he was reared on a farm and had worked about a turpentine place; (5) he and his brother were arrested at Lakeland, Florida, without warrant on a charge of murder; (6) the arrests were made upon the request of the Sheriff of Bradford County; (7) the Sheriff and Deputy went to Lakeland in an automobile for the two boys; (8) the State Attorney went to Lakeland in connection with the arrests, but in a separate car; (9) handcuffed the two boys were by the Sheriff and his deputy returned to the Sheriff's office at Starke; (10) the State Attorney arrived at about the same time at the office from his Lakeland trip; (11) the two boys had been drinking; (12) while at the Sheriff's office, the State Attorney asked the defendant to make a statement; (13) the defendant testified that "The State Attorney was angry when I refused and said, 'You know you are telling a damn lie' " which was denied by the State witnesses; (14) he was detained at the Sheriff's office a few minutes and about 8:45 P. M. the State Attorney directed the Sheriff to take the defendant to the State Prison at Raiford, a distance of about nine miles from Starke; (15) a warrant

charging a crime had not been served on him but he was told that he was held for the murder of Dan Moore; (16) the Sheriff, at the direction of the State Attorney, conveyed defendant by car from Starke to Raiford; (17) when the Sheriff told defendant that he was taking him to the State prison when about three-fourths of a mile out of Starke, the defendant told the Sheriff that he "killed Dan Moore"; (18) that he told the Sheriff to get the State Attorney: "I want to go before the judge and plead guilty and get it all over with;" (19) appellant denied making the statement to the Sheriff but stated that the Sheriff said to him: "If I would make a statement I would be brought back (from the State prison to Starke) and the statement would be used in court; that it would help me out in court;" the defendant was handcuffed at the time; (20) the defendant testified that the Sheriff told him on the road to Raiford that if he "plead guilty it would be a lot easier;" (21) this conversation occurred on the night of November 24th and Dan Moore was killed on the night of November 21, 1942; (22) the defendant's relatives lived near Theressa, a few miles from Starke, and they had no knowledge of defendant's arrest; (23) the Sheriff delivered defendant to the authorities at the State prison and he was imprisoned in the death house there; (24) occupying an adjoining death cell to defendant was Perry Acree, on one side, and Ruffie Lundon on the other, each awaiting the issuance of a death warrant and electrocution; (25) defendant had previously visited Raiford and observed the electric chair used for imposing the death penalty; (26) the following testimony of defendant was not wholly discredited:

"A. I was put in death row. That's in a line of cells running crossways, east and west, on the death row. Q. How far was that, approximately, from the electric chair? A. I don't know just how far it was, but it was just a little way. It was just across an opening outside. There's a little round place in there it looks like. Q. Were there any prisoners then being held for electrocution in the cells near you? A. Yes, sir. Q. Who were some of them, if you know? A. Well, the one that was right next to me, his name was Perry

Acree. He was in the cell next to me; and I don't remember the other's name, but one from Miami, and there was a colored fellow in there. There were several of them in there. Q. Awaiting electrocution? A. Yes sir. Q. What, if anything, did they say to you when you were located in that cell? A. Well, when they first locked me in the cell they didn't say anything until the guard went away; and then when they went away they started hollering, 'God damn. Fresh meat for the electric chair. God damn. Fresh meat for the electric chair.' " How long did they continue to holler at you out there in that death row? A. Well, they hollered at me in the day and talked to me and told me that if I didn't go on and give a statement I would be held there, and they were liable to electrocute me before they would give me a hearing or anything; that I would have to stay there until the trial and then be brought in for trial and then go back to the same old cell to be electrocuted from. Q. How old are you, Mr. Daugherty? A. I am a little better than twenty-one. Q. How much better? A. I am twenty-one years and nine months. Will be when this month is past. Q. Had you ever been arrested before? A. No sir."

(27) defendant was kept in the death cell row during the night and until the next afternoon:

"A. Well, when they put in there, they waited until the guards left the cells where they locked me up and then they started hollering, 'God damn, God damn. Fresh meat for the electric chair. Fresh meat for the electric chair.' and it like to have scared me to death. I hollered over and asked one of them could I talk with him. I didn't know anything about the law and I asked one of them what they would do, and they said, 'Well,— . . . Mr. Knight: How long did they continue to so holler at you as you have testified? A. Well, then, all the time I was in there. If they didn't hear somebody coming down the hall they continued it all the time. If they couldn't hear anybody coming down the hall they continued, and when they heard somebody coming they would stop. Q. Did you sleep any that night? A. No, sir; I never slept any that night. Q. Did you sleep any the next morning before the State Attorney came that afternoon? A. No, sir;

I never slept any at all. Q. When the State Attorney came, what condition were you in? A. Well, I was scared to death and didn't know what I was doing. Q. Had any of your relatives seen you since your arrest in Lakeland? A. No, sir. Q. Had you been able to secure counsel since your arrest? A. No, sir. Q. Had any friends visited you before the State Attorney came to get your statement? A. No, sir. Did you believe at the time the State Attorney came to visit you that you would be held in that death cell, as you had been told, until and unless you made a statement to satisfy him? A. Yes, sir; I did believe that. Q. Were you afraid to stay in that death cell? A. Yes, sir; I was afraid to stay in there. Q. Did the State Attorney make you any promises relative to the manner in which that statement, or any statement you made would be used? A. He told me that if I would make a statement it would be used for me in Court. Q. Are those the circumstances under which you made the statement which the State Attorney has introduced into evidence? A. Yes, sir. I made up my mind after I got there that I was not going to talk with anybody until my people came and got me a lawyer, and that I would talk to them first. Q. You had made up your mind to that? A. Yes. Q. Did you hold to that resolution? A. No, sir. Q. What caused you to make the statement then? A. Well, Mr. Duncan told me if I would give them a statement it would be used for me in court and that I would be brought back to the Starke jail. Q. That was your way of getting out of the death cell, was it? Mr. Duncan: I ask the Court to instruct counsel not to lead the witness. Q. Ernest, at the time you made that statement were you in fear, by reason of the treatment you had received? A. I were in fear; yes, sir. Q. Were you in a mental condition in which you were able to properly relate the facts that had occurred? A. I didn't quite catch that. Q. (Repeated by reporter); Were you in a mental condition in which you were able to properly relate the facts that had occurred? A. No, sir; I was not. I was scared to death. Q. Now, Ernest, how long after you made that statement was it before you were taken out of the death cell? A. Well, I made that statement on Wednesday afternoon and it was Saturday about noon

before they came and got me. Before Sheriff Andreu came and got me and put me in the Starke jail and put me in a cell with my brother. Q. Have you been in the Starke jail every since? A. I have been in the Starke jail ever since. A little better than seven months."

The defendant, on the fourth day after the homicide, was taken from the death cell row to an office in the same building, a distance of approximately 60 feet, and there met the State Attorney, Sheriff, and the Court Reporter. The State Attorney asked if he cared to make a statement, and he made one in the form of questions and answers, the questions being propounded by the State Attorney; and some of the proceedings but not all were reported by the court reporter and subsequently adduced into evidence. Shortly thereafter the defendant was returned from the State prison to the county jail at Starke. Section 901.23, Fla. Stats. 1941, makes it the duty of an arresting officer without warrant without unnecessary delay to take the arrested person . . . before a magistrate having jurisdiction, and make a complaint . . . setting forth the facts constituting the crime for which such person is held.

Section 901.24, Fla. Stats. 1941, provides an opportunity for a person charged with a crime to interview counsel. Section 902.03 makes it the duty of a magistrate to allow a defendant reasonable time to send for counsel—the magistrate shall cause an officer to communicate a message to counsel if requested by defendant. Section 902.04 makes it the duty of a magistrate, among others, to allow counsel a reasonable time prior to proceeding in a case before him. We have here an inexperienced, uneducated country boy charged with the highest crime known to the law, and who had never appeared during his lifetime before a court in any capacity. His relatives reside on a farm only a few miles from Starke. He was arrested without warrant, and, from the record, we observe, was never taken before a magistrate or judge or granted an opportunity to obtain private counsel; was taken from the County in which he and relatives resided and in which the crime was alleged to have been committed, and confined in a cell in death row at the State prison, and called therefrom by

the officers for the purpose of obtaining a statement or confession.

Section 11 of the Declaration of Rights provides, in part, that a person accused of a crime shall have a right to a speedy trial in the county where the crime was committed and shall be heard by himself or counsel, or both. Subsection (1) of Section 950.02, Fla. Stats. 1941, authorizes the Governor in behalf of the public interest and upon order of the circuit judge, may direct that any person held under a criminal charge shall be confined in the jail of another county of Florida than that in which the offense charged is alleged to have been committed. Subsection (2) of Section 950.02 confers power on a circuit judge to transfer to another county for safe keeping persons accused of crime. The order of the circuit court authorizes the sheriff to transfer the person accused of crime. It is the duty of the sheriff, after the removal, to make full report to the Governor, and in the report state the reasons for the removal. We have no citation of authority before us in the case at bar which authorized the sheriff of Bradford County, Florida, to transfer Ernest Daugherty from the jail of Bradford County to the State prison situated in Union County, Florida, upon the direction or command of the State Attorney.

It is settled law that when it is made to appear that a confession was freely and voluntarily made and no improper or unlawful influences or reward were held out to obtain it, then the confession can or may be admitted into evidence. On the other hand, if it is made or is obtained under conditions and circumstances calculated to be in derogation of rights vouchsafed by organic law, then it is reversible error to admit the same into evidence against the party making it. See Flowers v. State, 152 Fla. 649, 12 So. (2nd) 772, and the many leading cases cited therein. Practically the same rules govern as to incriminatory admissions. Louette v. State, 12 So. (2nd) 168, 152 Fla. 495.

The voluntariness of a confession was before this Court in one of the early cases which was decided in 1853. It is styled, Simon, a slave, v. State of Florida, and reported in

5 Fla. 285. He was indicted by a grand jury of Escambia County and subsequently placed upon trial before a jury and during the progress of the trial a confession was admitted into evidence over objections of counsel for the defendant. It appears that the confession was obtained from the defendant below under the following conditions and circumstances:

Simon, the slave, was arrested on suspicion and carried before a justice of the peace. A large and excited crowd followed the prisoner to the office of the justice of the peace, but remained without the office of the justice but within the vision or observation of the accused. The accused was frightened and the magistrate urged him to confess his guilt (as the mob was satisfied as to his guilt), and saying that he (the slave) would be placed upon trial and hanged, but his life could be saved by turning State's evidence.

We held the confession was unlawfully obtained and upon appeal here granted a new trial. It was said (text 5 Fla. 296):

"To render a confession voluntary and admissible as evidence, the mind of the accused should at the time be free to act, uninfluenced by fear or hope. To exclude it as testimony, it is not necessary that any *direct* promises or threats be made to the accused. It is sufficient, if the attending circumstances, or declarations of those present, be calculated to delude the prisoner as to his true position and exert an *improper and undue* influence over his mind."

This holding has been reaffirmed here on many occasions and is in harmony with numerous cases of the Supreme Court of the United States. See Chambers v. State of Florida, 309 U. S. 227, 60 S. Ct. 742; 84 L. Ed. 716; Bram v. United States, 168 U. S. 532, 17 S. Ct. 183, 42 L. Ed. 568; Ziang Sung Wan v. United States, 266 U. S. 1, 45 S. Ct. 1, 69 L. Ed. 131; White v. Texas, 310 U. S. 530, 60 S. Ct. 1032, 84 L. Ed. 1342; Ward v. Texas, 316 U. S. 547, 62 S. Ct. 1139, 86 L. Ed. 1663; McNabb v. United States, 318 U. S. 9, 63 S. Ct. 394, 87 L. Ed. 579; Anderson v. United States, 318 U. S. 350, 63 Sup. Ct. 598, 87 L. Ed. 829.

Counsel for appellee contends that even though this Court should hold or conclude that the confession, identified in the record as State's Exhibit No. 1, was unconstitutionally obtained, and erroneously adduced into evidence, there was then appearing in the record, independently of the confession, sufficient testimony to sustain the verdict and judgment of the lower court. It is true that State's Exhibit No. 3 is an alleged confession of the appellant made to the Lakeland police officers, and Exhibit No. 4 is a purported copy of Exhibit No. 3. The appellant, during the trial, defended under the law of self defense and the trial court instructed the jury on this theory of the case, we observe a broad difference in the content of the two confessions.

It is true that the charge alleged in the indictment was by the jury's verdict reduced to second degree murder. Whether or not the verdict would have been further reduced had not the confession identified as State's Exhibit No. 1 been admitted into evidence is entirely speculative. The confession was unlawfully obtained and erroneously admitted into evidence. For this reason the judgment of the lower court should be reversed and a new trial awarded.